BEATTY, Justice.
This is an appeal by the defendants, First National Bank of Pulaski, Tennessee, (Bank) and Parmenas Cox and Robert Curry, individually and doing business as a partnership, Cox and Curry Insurance Agency in Pulaski, Tennessee, from a judgment for plaintiffs, Carl R. and Delma M. Thomas. We affirm.
The town of Ardmore is located in the northern part of Limestone County, Alabama, and is separated from the town of Ardmore, Tennessee, by Main Street. The Ardmore branch of the Bank fronts on the northern, or Tennessee, side. At the times material to this case, Parmenas Cox was chairman of the Bank’s board of directors and Robert E. Curry was the Bank’s president. Cox and Curry were also partners in a general insurance agency under the name of Cox and Curry Insurance Agency. They conducted their business in Ardmore by utilizing the offices and the employees of the Bank, paying the Bank for employee services, rent, and utilities, with the commissions (40%) on policies sold going to the Bank. Barbara Hodges, a resident of Limestone County, was manager of the *1315 Bank’s Ardmore branch. In its operations, the Bank made credit life and disability insurance available to its customers through the Cox and Curry Insurance Agency, with the Bank writing the policies.
Plaintiffs Carl R. and Delma M. Thomas, husband and wife, are Alabama residents, living in Elkmont in Limestone County near Ardmore, Tennessee. They owed a mortgage indebtedness to the Bank which covered their home and an adjoining rental house. On March 13, 1978, the Thomases refinanced this existing loan with the Bank, evidenced by a promissory note. The Bank furnished a disclosure statement.
On July 17,1978, Carl Thomas suffered a heart attack and has not worked since that date. The Thomases refinanced their Bank indebtedness in each of the years 1979 through 1982. Shortly after the 1982 renewal, Billy Bell, an employee of the Bank who acted as a bank guard and an appraiser and collector, went to plaintiffs’ premises. He measured the Thomases’ house but did not go inside. Bell then went next door to the Thomases’ rental house. He was invited inside by the tenant, Suzanne Py-lant, who knew Bell. Bell left shortly thereafter.
On October 13, 1982, the Thomases brought this action against the defendants, claiming damages for breach of contract and trespass, among other claims. Plaintiffs’ contract claim alleged that on March 13, 1978, defendants agreed to insure Carl R. Thomas for credit life and disability insurance in the amount of $22,834.88 in consideration of a premium in the amount of $302.83 paid by plaintiffs; that plaintiff Carl R. Thomas suffered a heart attack on July 17, 1978, with his resulting complete disability; that the disability benefits thereupon became due and payable, but that the defendants had failed and refused to pay them.
As amended, the trespass count alleged:
“2. The said Defendant Bank caused said uniformed guard, while dressed as a law enforcement officer and while armed, to enter upon the real estate owned by the Plaintiffs and in their possession, including the home and the dwelling house of the Plaintiffs, the curtilage thereto, as well as an adjoining dwelling house and the curtilage thereof, with knowledge on such Defendant’s part that such an intrusion was an invasion of the rights of the Plaintiffs; the said Defendant intentionally acted and which resulted in the invasion of the rights of the Plaintiff, and said Defendant reasonably foresaw that the act done would result in an invasion of the Plaintiffs’ possessory interest and damages to the Plaintiff.
“3. On said occasion, the Plaintiffs owned said land, or the Plaintiffs were in possession of said land, and the said Defendant Bank, by its agent, intentionally and with force, trespassed on Plaintiffs’ land without the Plaintiffs’ consent, the force being implied, and the Plaintiffs were damaged by the Defendant’s entry. The market value of the Plaintiffs’ real estate was decreased, the Plaintiffs were subjected to humiliation, embarrassment and emotional suffering and distress; the Defendant’s trespass on Plaintiffs’ land was attended by rudeness, wantonness, recklessness, or was done in an insulting manner, or was accompanied by circumstances of oppression or aggravation or gross negligence, and the Plaintiffs are entitled and expressly claim punitive damages.”
Defendants Cox and Curry moved to dismiss the claim on the ground that no personal jurisdiction existed over them. This motion was overruled, whereupon they made a general denial. The Bank denied that the Thomases applied for or paid for disability insurance or that the Bank agreed to insure against disability. The Bank also denied the allegations of trespass.
At the conclusion of plaintiffs’ case and at the close of the evidence, defendants’ motions for directed verdicts were denied. The jury returned a verdict against the Bank and Cox and Curry on the contract claim in the amount of $30,723.00. It returned a verdict against the Bank on the trespass claim in the amount of $25,000.00. *1316 Post-trial motions for a new trial and for judgment notwithstanding the verdict were denied, and all defendants appealed.
The first issue raised by appellants Cox and Curry is whether or not the Circuit Court of Limestone County had personal jurisdiction over them.[1] It is their contention that no jurisdiction existed, as evidenced by an affidavit filed with their motion to dismiss and by the testimony of Parmenas Cox. They have established, it is argued, that at all times they were residents of Tennessee; that they were licensed to do business within Tennessee; that they did business only in Tennessee; and that all of the transactions in question occurred in Tennessee. Thus, they insist, there were no contracts within the state of Alabama relative to the subject matter upon which to bestow in personam jurisdiction. To the contention that Rule 4.2(a)(2)(G), A.R.Civ.P., gave jurisdiction, they maintain that there is a complete absence of evidence that any of their agents or employees agreed to obtain disability insurance for plaintiffs. To the contrary, these defendants argue, all of the plaintiffs’ contracts were with employees of the Bank only, and there was no evidence that the Bank employees acted as employees of Cox and Curry. Rule 4.2(a)(2)(G) reads as follows:
“(2) Sufficient contacts. A person has sufficient contacts with the state when that person, acting directly or by agent, is or may be legally responsible as a consequence of that person’s:
[[Image here]]
“(G) Contracting to insure any person, property, or risk located within this state at the time of contracting ....”
In Alabama Power Co. v. VSL Corporation, 448 So.2d 327 (Ala.1984), this Court adopted the reasoning contained in Garrett v. Key Ford, Inc., 403 So.2d 923 (Ala.Civ.App.1981):
“ ‘The ultimate test of in personam jurisdiction is “reasonableness” and “fairness” and “traditional notions of fair play and substantial justice.” ’ Oswalt v. Scripto, Inc., 616 F.2d 191, 200 (5th Cir.1980). That case merely restated the rule announced in the leading case of International Shoe Co. v. State of Washington, etc., 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), that an in personam judgment may be rendered against a nonresident if he has certain minimum contacts so that the maintenance of the suit does not offend ‘traditional notions of fair play and substantial justice.’ 326 U.S. at 316, 66 S.Ct. at 158.” 403 So.2d at 925.
In VSL Corporation, this Court held that a Minnesota steel fabricating corporation, which did not actively solicit business in Alabama and had no officers, directors, or employees in Alabama, nevertheless was amenable to Alabama process, because the company knew that its products were to be used in Alabama and were actually shipped to Alabama.
Considering the requirement of “minimum contact,” this Court has quoted with approval the passage from 2 J. Moore, Federal Practice, par. 4.25, pp. 4-258 through 4-267 (2d ed. 1982), in View-All, Inc. v. United Parcel Service, 435 So.2d 1198 (Ala.1983), especially the following at 1201:
“If there are substantial contacts with the state, for example a substantial and continuing business, and if the cause of action arises out of the business done in the state, jurisdiction will be sustained. If there are substantial contacts with the state, but the cause of action does not arise out of these contacts, jurisdiction may be sustained. But if there is a minimum of contacts, and the cause of action arises out of the contacts, it will normally be fair and reasonable to sustain jurisdiction. If there is a minimum of contacts and the cause of action does not arise out of the contacts, there will normally be no basis of jurisdiction, since it is difficult to establish the factors nec *1317 essary to meet the fair and reasonable test.”
The evidence in this case disclosed that the Cox and Curry Insurance Agency handled many insurance policies dealing with Alabama transactions. The Bank branch, in fact, was placed at Ardmore to serve the trade area which included Limestone County and it drew many customers from the entire area. Additionally, Cox and Curry were principal officers of the Bank, whose employees wrote or offered insurance for their agency in connection with its many real estate loans on property in Alabama. The record shows that Barbara Hodges, manager of the Ardmore branch of the Bank, talked with Cox and Curry from time to time and conferred with them regarding the insurance written by the Bank. An employee of the Bank, Gail Gower, filled out the loan disclosure form for the plaintiffs’ 1978 loan and also handled the insurance in connection with that loan, placing it with the Cox and Curry Insurance Agency. Under those circumstances, it is both fair and reasonable to require Cox and Curry to come to this state and defend this action, and does not offend principles of due process. DeSotacho, Inc. v. Valnit Industries, Inc., 350 So.2d 447 (Ala.1977); Rule 4.2, A.R.Civ.P., and comments. Thus, we hold that Alabama had personal jurisdiction of Cox and Curry based on their service by certified mail.
The second issue raised by the defendants is whether there was any evidence of an agreement between the parties for disability insurance.
On this question of insurance, the evidence is disputed. Prior to the renewal of plaintiffs’ loan on March 13,1978, plaintiffs had borrowed money from the Bank in 1976, giving a mortgage on their home in return. In the spring of 1977, plaintiffs had purchased additional real estate and refinanced their original loan. Plaintiffs’ exhibit number one, the Bank’s copy of the disclosure statement for that 1977 loan, contained the following statement under “Insurance”: “I desire credit life and disability insurance. Cost $192.89 for the term of credit.” (Emphasis added.) The “yellow” copy of this disclosure statement given to Carl Thomas, however, did not duplicate that “Insurance” item but did contain this marginal notation: “Credit Life (not required by bank, customer directs payment to Cox & Curry, Agent). $192.89.”
When the identical loan amount, $22,-834.88, was refinanced on March 13, 1978, the “yellow” copy of the loan disclosure statement contained the same reference to credit life and disability insurance; however, the premium cost was stated as $302.83. Again, the marginal reference on the same form, although stating the premium as $302.83, referred only to “Credit Life.”
In describing the 1978 loan agreement, Carl Thomas testified:
“I refinanced it and I told Mrs. Gower that I wanted credit life and disability insurance and she said if I got sick it would pay for it — the payments on it until I got better able to work and at the end of the year — it was a twelve month contract — at the end of the year if I was totally disabled to work, it would be paid for, if I died it would be paid for.”
His testimony was corroborated by Mrs. Delma Thomas, who testified concerning the 1978 transaction:
“I know we talked about insurance. My husband distinctly told Mrs. Gower that he wanted credit life and disability insurance if it was available.”
Plaintiffs had been directed to Mrs. Gower by Ms. Hodges, the Bank branch’s senior managing officer. Parmenas Cox himself testified:
“Q. Ms. Gower, when she handled this transaction in March of 1978, she was acting for and on behalf of Cox and Curry Insurance Agency with reference to the insurance?
“A. I wish I was permitted — with your permission, I would like to explain a little bit about the relationship of the insurance agency and the bank.
*1318 “Q. Well, all I am getting at — I know that she worked for the bank but she was acting on behalf of the insurance agency with reference to the insurance; was she not?
“A. That’s right.
“Q. And she was acting on behalf of the bank with reference to handling the loan transaction?
“A. That’s correct.”
In this case, the plaintiffs sued upon the defendants’ alleged agreement to insure plaintiff for credit life and disability insurance, as well as an alleged insurance contract. The trial court submitted to the jury the question whether there had been a contract “whereby the Defendants agreed to produce or furnish to them a policy of disability insurance.”
In Highlands Underwriters Ins. Co. v. Elegante Inns, 361 So.2d 1060 (Ala.1978), this Court stated at 1065:
“Once the parties have come to an agreement on the procurement of insurance, the agent or broker must exercise reasonable skill, care, and diligence in effecting coverage.... When the agent or broker has failed in the duty he assumes, the principal may sue either for breach of the contract or, in tort, for breach of the duty imposed on the agent or broker_” (Citations omitted.)
That quotation follows the general principle approved in American Life Ins. Co. of Alabama v. Carlton, 236 Ala. 609, 184 So. 171 (1938), and provided in 43 Am.Jur.2d Insurance § 161 (1982):
“Instead of making a contract of present insurance, the parties may make an agreement to enter into a contract of insurance at a future date. Such execu-tory contracts to insure in the future are valid and enforceable, even though oral, if all the other essentials of a valid contract are present.”
The Bank argues that its customary business practice was to type the insurance coverage on the left margin of its promissory notes, and points out that the seven notes executed by the Thomases between 1972 and 1982 referred to “Life Ins.” or “Life Insurance,” the 1978 note containing the notation, “Life Ins. $302.83.” The evidence of the Thomases, however, is that the copies of the disclosure statements for 1977 and 1978 refer to credit life and disability insurance, that Mrs. Gower made the representation referred to earlier, and further, that the Thomases were never provided with any policy or shown any agreement between them and the Cox and Curry Insurance Agency, the Bank, or any insurance company.
The facts adduced established reasonable inferences that Mrs. Gower was an agent for the Cox and Curry Insurance Agency, as well as for the Bank, to provide disability insurance coverage for plaintiff Carl Thomas for the consideration expressed in the disclosure statement. That issue, it follows, was properly submitted to the jury; hence, the trial court did not err in refusing to direct a verdict for the defendants on this issue. Cf. Allstate Ins. Co. v. Richards Electric Co., 447 So.2d 175 (Ala.1984).
The Bank also argues that the trial court erred in regard to the plaintiffs’ trespass count by failing to grant its motions for directed verdict and judgment notwithstanding the verdict. On appeal, the Bank asserts that it had a right to possession of the property in question under its mortgage given by the Thomases. The record discloses that this defense is being raised for the first time on appeal. In the sequence of pleadings, the Thomases alleged trespass by the Bank in Count Eight of their complaint. In its “Answer to Count Eight,” the Bank entered a general denial. It is clear from a reading of the record that under its plea of general denial the Bank’s evidence was directed toward establishing consent or permission to enter the Thomas-es’ premises.
Moreover, the trial court’s oral instructions to the jury did not cover the Bank’s present claim of a right of possession by virtue of the mortgage. On the trespass count, the trial court charged as follows:
*1319 “Now, in order for the Plaintiffs to prove to you or reasonably satisfy you that there was a trespass, they have the burden to show you or reasonably satisfy you from the evidence of several things. First of all, they must show you that they had title to the property or land and I don’t think there is any dispute about whether they owned the property. Secondly, they must show that they were in possession of this land and I don’t think there is any dispute about that.... Now, the Defendant, in answer to the charge of trespass, says that they had permission to enter upon the land. That is, they had consent to walk upon the plaintiff’s land....”
Following the giving of this charge, all defendants expressed satisfaction, and no further instructions were requested.
The assertion now, for the first time, that the Bank as mortgagee had a right to enter upon plaintiffs’ premises raises a theory which we cannot consider. Dixie Highway Express, Inc. v. Southern Railway Co., 286 Ala. 646, 244 So.2d 591 (1971). Having permission or consent to enter upon the land, on the one hand, and having the right as mortgagee to enter upon that land, are obviously inconsistent and different theories. Having permission or consent implies that plaintiffs had the right to control the Bank’s entry, while having the right to enter the land as mortgagee implies a right of entry not dependent upon permission or consent of the plaintiff mortgagors. Having tried its case below on the theory of consent, the Bank cannot now pursue the new theory of entrance by right as mortgagee.
Additionally, the Bank contends that there was no evidence of trespass. It is undisputed that Bell was acting for the Bank at the Thomases’ premises. Employee Bell, according to the Bank, went to the Thomases’ property to make a routine appraisal and did so without incident. He was greeted at the residence by Lowell T. Mays, Mrs. Thomas’s brother, who acceded to Bell’s purpose to step off the lot lines. According to the Bank, Bell was also allowed to appraise the rental property occupied by Mrs. Pylant, who knew Bell was employed by the Bank.
Mays, testifying for the plaintiffs, denied giving Bell any permission to come on the property and stated that he told Bell: “You should wait until they return. They should be back any minute.” Bell’s response, according to Mays, was: “That’s all right. I will step it off.” Mays said that Bell spent 15 to 20 minutes on plaintiffs’ property. According to plaintiffs’ evidence, Bell was wearing a uniform the same as that worn by members of the Ardmore Police Department, with the logo of that department on each shoulder. The evidence disclosed that the Town of Ardmore had not authorized the wearing of that uniform by Bell. According to Mays, Bell had in his possession a .38-caliber revolver.
Mays further testified that when the Thomases arrived 30 minutes after Bell’s departure, he reported Bell’s visit and it caused them to become very upset. Mrs. Thomas testified on cross-examination that Bell’s visit upset her and that she was sure it decreased the value of their property “if people thought we were having to sell our property.” She also testified that she became ill and remained in bed for three weeks on account of Bell’s visit. Carl Thomas himself testified that he was humiliated and embarrassed by Bell’s being out there, because people who knew he was “down and out” might have wondered whether he was about to lose his property. He also stated that he became emotionally upset, could not sleep, and also lost 20 pounds in weight following Bell’s visit. There was also evidence that Barbara Hodges, the Bank manager, knew of Carl Thomas’s heart condition.
The Bank also argues that there was no evidence of any damage to the Thomases or to their land. On that issue, the plaintiffs alleged:
“The market value of the Plaintiffs’ real estate was decreased, the Plaintiffs were subjected to humiliation, embarrassment and emotional suffering and distress; the Defendant’s trespass on Plaintiffs’ *1320 land was attended by rudeness, wantonness, recklessness, or was done in an insulting manner, or was accompanied by circumstances of oppression or aggravation or gross negligence, and the Plaintiffs are entitled and expressly claim punitive damages.”
In his oral charge to the jury, the trial judge instructed that under the evidence the jury could not award any recovery for substantial damages to the plaintiffs’ land should they find that a trespass occurred. That instruction did allow nominal damages, and also, should the jury find a trespass, punitive damages if the trespass “was done ... in a manner which was rude or which was wanton or which was reckless or which was insulting or which was malicious or oppressive.”
The evidence for plaintiffs established that they were in possession of the land in question and had not given the Bank or Bell permission to enter it. Under that evidence, the jury could have found that Bell was a trespasser and that plaintiffs were entitled to nominal damages. Johnson v. Martin, 423 So.2d 868 (Ala.Civ. App.1982); Foust v. Kinney, 202 Ala. 392, 80 So. 474 (1918). Moreover, punitive damages may be awarded in a trespass action for a trespass attended with rudeness, wantonness, recklessness, or an insulting manner, or accompanied by circumstances of fraud and malice, oppression, aggravation, or gross negligence. Rushing v. Hooper-McDonald, Inc., 293 Ala. 56, 300 So.2d 94 (1974). Rushing also contained citations to well-established authorities allowing recovery for mental suffering proximately caused by trespass to property committed under circumstances of insult or contumely. These principles .have been applied in cases similar to the case at bar. In Dixie Construction Co. v. McCauley, 211 Ala. 683, 686, 101 So. 601, 603 (1924), involving a trespass by searching for stolen property, this Court found no error in the allowance of consequential and punitive damages, stating:
“The wrong complained of, though committed with the politeness of a Chesterfield, was calculated to bring an honest person into public contempt, to humiliate a just pride, and to wound proper feeling. For such wrong plaintiff was entitled to substantial damages .... Mattingly v. Houston, 167 Ala. 167, 52 So. 78.”
And, in Mathers v. Taylor, 47 Ala.App. 124, 251 So.2d 622 (1971), a trespass case involving a seizure of personal property from plaintiffs’ home by one claiming to be a sheriff, the Court of Civil Appeals held that the circumstances warranted an award of punitive damages.
In this case, the jury could have reasonably concluded that Bell, while wearing the uniform of the Ardmore Police Department, which he was not authorized to wear, with a revolver strapped to his side, went upon the plaintiffs’ land without permission and spent 15 to 20 minutes there, stepping off the length and width of the two houses located there. He was asked by Mrs. Thomas’s brother to wait but refused to do so. He was observed by a neighbor, Mrs. Pylant, by plaintiffs’ son, and by Mrs. Thomas’s brother, Mays. The Thomases, being pressed financially, testified to humiliation, embarrassment, and mental anguish at the prospect of losing their home. This evidence satisfied the scintilla rule and made the issue of damages, nominal and punitive, one for the jury. Hickox v. Vester Morgan, Inc., 439 So .2d 95 (Ala.1983).
The final argument of the defendants concerns alleged misconduct toward the jury. It is contended that Avis Cremin, Mr. Thomas’s sister, made an improper contact with at least one juror which was calculated to and did result in prejudice to the defendants. The circumstances surrounding this episode are as follows:
Following the noon recess, taken after the defense had rested, the Bank’s counsel informed the trial court of statements made to him by two of his witnesses, Bell and Gower. These witnesses had told him that they had overheard Avis Cremin talking to a group of jurors and that she had talked to one of them for four or five minutes. Thereupon, the trial court, out of *1321 the jury’s presence, allowed the Bank’s counsel to question Avis Cremin under oath. The record shows that Ms. Cremin did state to a person something she had heard someone else say. She testified that she did not know the person was a juror; that she was excited and, not speaking specifically to that person, said: “Thank God, I think they have settled it.” She testified that she had no other conversation with that person. In addition, she said she was with another group of people and they all were talking about “the water being up at the A & P parking lot.” She said she did not recognize any of these persons as being jurors and denied talking to any jur- or about any matter pertaining to the case. She conceded that she said to someone that she was afraid that her brother would not live to get home. She made the remark to nobody in particular, she said, but she believed she said it to Mr. Thomas’s stepdaughter Patty. She also said to Mr. Cox that her brother was under a lot of stress. Ms. Cremin said she was “pretty sure” that there were no jurors present when this statement was made. According to her testimony, several members of the Thomas family were in court throughout the trial, and it is inferable from the record that these exchanges occurred during recess.
It was also established that Ms. Cremin was not a witness and had not participated in developing the case for plaintiffs, and, according to her, she did not “even know what [was] going on.” She had also noticed some of the bank people in the hall during recess talking back and forth. The plaintiffs themselves did not mingle or congregate with any jurors. At the conclusion of the testimony, defendants Cox and Curry moved for a mistrial, which was denied.
Although sensitive to the requirement of a fair and impartial jury free from outside influences, Alabama Gas Corp. v. American Furniture Galleries, 439 So.2d 33 (Ala.1983), this Court cannot conclude from these circumstances that the trial court was in error in refusing to grant the motion for a mistrial. No juror was called, and there was no other evidence proffered to establish either improper contact or that any juror was prejudiced. Casual and ordinary civilities, even between parties and jurors during recesses, do not suffice to avoid a verdict, if no sinister purpose and no effect upon a juror are apparent. Louisville & Nashville R.R. Co. v. Turney, 183 Ala. 398, 62 So. 885 (1913).
There being no reversible error under the issues raised by the defendants, the judgment must be, and it is, affirmed.
AFFIRMED.
MADDOX, JONES, SHORES and EM-BRY, JJ., concur.

. The Bank raised no issue of jurisdiction throughout the proceedings in the trial court, and raises none on this appeal.