709 So.2d 1132 (1997)
FLAGSTAR ENTERPRISES, INC.
v.
Maureen DAVIS.
1960141.
Supreme Court of Alabama.
September 12, 1997.
Rehearing Denied January 23, 1998.
*1133 Bert P. Taylor and Scott P. Hooker of Taylor & Smith, P.C., Birmingham, for appellant.
Gary D. Hooper and R. Stephen Griffis of Hooper & Griffis, P.C., Birmingham, for appellee.
HOUSTON, Justice.
The defendant, Flagstar Enterprises, Inc. ("Flagstar"), appeals from a judgment entered on a $250,000 general jury verdict ($100,000 in compensatory damages and $150,000 in punitive damages) for the plaintiff, Maureen Davis, in this action seeking damages under theories of negligence and wantonness and under the Alabama Extended *1134 Manufacturer's Liability Doctrine ("AEMLD"). We reverse and remand.
Davis sued after discovering human blood in a styrofoam package containing a biscuit with gravy; she had purchased the biscuit from a Hardee's restaurant, which was operated under a franchise agreement with Flagstar. The evidence, viewed in the light most favorable to Davis, as it must be in accordance with our standard for reviewing the denial of a motion for a judgment as a matter of law,[1]St. Clair Federal Savings Bank v. Rozelle, 653 So.2d 986 (Ala.1995), was set out in Davis's brief as follows:
"On November 30, 1993, ... Davis ..., a long-time resident of Columbiana, Alabama, was employed as a cashier at the BP [gasoline] station in Columbiana, Alabama. Davis's job duties included posting all charges and supervising all the other employees. On November 30, 1993, the other employees that worked at the BP station with Davis were Eric Cohill (hereinafter `Eric') and Kevin Cohill (hereinafter `Kevin'). Davis, a trusted employee, had a set of keys to the BP station and was the first one to arrive [at] work every day at approximately 4:304:45 a.m. Eric and Kevin would generally arrive at work just prior to 5:00 a.m. when the BP station was to open for business.
"It was customary [for] one of the BP employees [to] go and get breakfast for everyone when there was a slowdown in customers. Davis was in charge of the counter and that meant either Eric or Kevin would leave the BP station to get breakfast. The Hardee's Restaurant ... was across the street less than a half a block away from the BP station. Davis, Eric and Kevin would order breakfast approximately three days a week from Hardee's.
"On the morning of November 30, 1993, at approximately 6:00 a.m., Davis suggested that they get something to eat before it got real busy again, and Eric was elected to go. Eric collected money from Davis and from Kevin and went to Hardee's to get the orders. Davis told Eric that she wanted a biscuit and sausage gravy and handed him the money.
"At approximately 6:05 a.m.... Eric left the BP station and went to the Hardee's. Eric left the BP station in his car, drove to Hardee's and went inside. Eric placed the order and after waiting only a minute or two, received from the Hardee's employee all of the food placed in one sack [that was] folded over the top. Eric Cohill never opened the sack between the time he was handed the sack by the clerk and when he arrived back at the BP station. Eric was gone a total of approximately five to six minutes. When Eric returned to the BP station he set the sack containing all three meals on the counter to go out and attend to a customer who was driving up to the gas pump. After handling that customer, Eric came back inside and remembers Davis handing out the food to everybody. Davis testified that her meal was contained in a separate sack that was inside the large sack that also had Eric and Kevin's meals. Davis did not open her sack at that time.
"While Eric and Kevin were tending to customers over the next few minutes, Davis took her food out of the sack, opened the styrofoam container that held the meal, [and] poured the gravy on top of the biscuit in the styrofoam container. Davis described this process as follows:
"`Q. You actually took your food out and started eating before they came in?
"`A. Yes, sir.
"`Q. Let's talk about that for a second. You took your food out of the bag, the large bag. And tell us what you did.
"`A. I pulled mine out and throwed my sack away and opened the container up. I had customers coming in back and forth. Some customers paid for their own gas. Instead of giving it to the boys out there, they came on in because some people charge and they made their personal charges. And I opened the container up. I openedthere was a *1135 small container on the right-hand side, a big styrofoamnot a big but a fairly medium-size styrofoam plate. I opened it up, poured the gravy on the biscuit. I throwed the other container away.'
"Davis began to eat her gravy and biscuit while attending to the four or five customers who came into the store during this time period. Davis described this period as a time which she was `sneaking bites' out of respect for the customers who were in the store. Davis testified as follows:
"`Q. Let me ask you this before we go too much further from this point. When you were making the biscuit, you know, you said you poured the gravy on there and snuck some bites. How come it was that you couldn't see that blood at that point?
"`A. I've asked myself that a thousand times, sir. I was not ever opening the tray up and just really paying attention. I was just opening it up a little and the hinge lidit had a hinge lid where it was made together would lay on the top of your hand like and I would just cut me a little bite and slip it. So at no time had I ever really opened it up and just really looked because I'm trying to steal or slip little bites discreetly as the customers were coming back and forth. And I guess I was taller and the tray was down here and so'
"During the entire time from when Davis took the small sack out of the large sack, she had the small sack and the styrofoam container in her view and control. Davis testified as follows:
"`Q. I have a couple of questions. Maureen, when Eric came in and he put the bags on the counter and then you took yours out of the bag like you have shown us here this morning and you laid itI think you said on the credit card machine?
"`A. Yes, sir. It was still in the bag when [I laid it] up there.
"`Q. In the bag on the credit card machine?
"`A. Yes, sir. It was in its own individual bag. I don't think anybody understands that yet.
"`Q. At some point, you took it out of that bag and put it in front of you?
"`A. Yes, sir.
"`Q. Was it in front of you like you have shown us here this morning when you stood up here in front of our table?
"`A. Yes, sir, on the counterthat counter was not a regular 30-inch counter. It came up a little higher.
"`Q. And so it would have been there the entire time until you actually saw what was in there?
"`A. Yes, sir.
"`Q. Would there have been any opportunity in between the time you took it out of its bag and put it in front of you and began to eat that a customer could have bled inside this thing?
"`A. No, sir, because I didn't ever even open it up not even a full halfway to even throw this biscuit over and throw that gravy in there. I mean I say throw. That's poor use of my vocabulary, but put it together. Because as far as I could tell the blood was all on the inside and it must have been on the top of the lid and come down after a period of time after me eating it, shutting that lid back and forth is the only way it could have got down. It was on the inside of the lip and then it finally got on the bottom lip by closing it back and forth, sticking it together and [then] eventually went down in my biscuit.
"`Q. To the best of your knowledge, no opportunity for someone to have
"`A. No, sir.
"`Q. spilled blood in it as they handed you money; is that right?
"`A. No, sir. I would be over a hundred percent sure. That's how sure I am.'
"At approximately 6:30 a.m., there was a lull in the customers and all three of the BP employees sat down to finish their meals. This was when Davis, for the first time, completely opened her styrofoam container to finish her meal. At this time, *1136 Davis discovered the blood. Davis became hysterical, and got sick. Immediately, Eric and Kevin checked each other and Davis to see if anyone had any cuts and none were found. At about the same time, Ann Sartain, a customer, entered the store. Ms. Sartain saw the blood which was completely on the inside of the carton. Neither Eric, Kevin or Davis observed any blood on any other part of the Hardee's bags or other food except the styrofoam container containing Davis's food. Once the blood was discovered in Davis's food, Eric and Kevin threw their food away.
"During the confusion over the next few minutes, Davis, while still very upset, called Hardee's and conveyed her fears of just having ingested human blood and that she might have contracted [the AIDS disease]. Davis was told by the Hardee's employee that, `she would relay the message,' and then the Hardee's employee hung up. Davis then called the Shelby County Health Department, but it was too early and the office was not open.
"Davis continued to try to phone the Shelby County Health Department and finally was able to talk to [a representative of] the Health Department. At approximately 10:00 a.m., Larry Rush of the Health Department came to the BP station. Ann Sartain was in and out of the store that morning assisting Davis because she knew how upset she was. Larry Rush suggested that Davis get an AIDS and hepatitis test at the Health Department, and also wanted to inspect the bloody food.
"Later that day, Davis placed the food container in an ice cooler to preserve it and ..., at approximately noon, Michael Anderson, an investigator for the law firm of Emond & Vines, picked up the ice chest with the container. Between the time of the discovery of the blood and when it was picked up by Michael Anderson, Davis carefully guarded the evidence.
"Davis subsequently went to the Health Department and had an AIDS and hepatitis test, and had a follow-up test approximately six months later. These tests were all negative.
"On December 1, 1993, Michael Anderson took the evidence to Larry Huys with the Alabama Department of Forensic Sciences. Mr. Huys is employed by the Alabama Department of Forensic Sciences in Birmingham, Alabama, in the Biology Unit section, which is responsible for examining items for the presence of body fluid stains, such as blood, saliva, semen, etc. Mr. Huys received the package on December 1, 1993, and was asked to determine if the stain on the food was human blood.
"Mr. Huys performed tests on the food the same afternoon. Mr. Huys performed a benzidine test, which determines whether or not the item is, in fact, blood, and then performed the precipitin test which confirmed the blood was of human origin.
"Mr. Huys properly documented his chain of custody and returned the evidence to the plaintiff's attorney after completion.
"....
"Davis has set out in detail in the Statement of the Case the extensive efforts that were made by Davis in order to obtain basic discovery in this case. Despite initial discovery [requests] having been filed with the complaint ..., Davis was not provided with a complete list of the employees who were working for the Hardee's Restaurant on the day in question until April 26, 1996 (only three months before trial). The court allowed Davis to introduce into evidence exhibits number 18, 19 and 20, which were part of Davis's discovery filed with the complaint and defendant's responses thereto. What this evidence shows is that despite [the] fact that Flagstar would have had no difficulty producing the [names] of all employees working on any given day and any given time (based upon time and other employment records), Flagstar did not provide the name of Annetta Cohill to Davis until April 18,1996.
"Davis filed a request for production on the defendant with the complaint. Request for production number 3 requested the following information:
"`3. Identify each and every employee or agent of this Defendant that was present at the restaurant involved in the *1137 incident made the basis of Plaintiff's complaint.'
"When Flagstar filed its response to request for production number 3, Flagstar stated as follows:
"`3. Hilda BryantBreakfast Manager. This request will be supplemented pending further discovery.'
"It was not until April 26, 1996, less than ninety days from trial when Flagstar finally produced the list of employees working at the Hardee's on November 30, 1993. This list included the name of Annetta Cohill. Davis's counsel contacted Ms. Cohill. Annetta Cohill (who was identified as a former employee) is the aunt of Eric and Kevin Cohill. As a part of the crossexamination of Annetta Cohill, substantial portions of the deposition were read to her and placed into the record without objection by Flagstar. Particularly, Annetta Cohill admitted in her deposition testimony and in her trial testimony, under oath, that when Davis's counsel inquired as to whether or not she had information with regard to the bloody biscuit, her first response was, `I could have cut myself,' [and] `It might have been my blood,' and that her supervisor, Hilda Bryant, sent her home early on that day. It is critical for the Court to understand that this was admitted by Ms. Cohill to be her initial response to Davis's attorney at a time when she thought that she was talking to [a] Hardee's attorney.

"Despite admitting under oath that she had made these statements to Davis's counsel, in her deposition and at trial, Ms. Cohill repeatedly stated that these statements were all made under the mistaken impression that she was talking to [a] Hardee's attorney. Ms. Cohill admitted that subsequent to this conversation, she called Hardee's to discuss this case and was referred by Hardee's to their counsel. Ms. Cohill testified that she met with Hardee's counsel at the Hardee's Restaurant after the conversation with Davis' counsel on April 29, 1996, and before her deposition on May 2, 1996. Subsequently, in her deposition and at trial, Ms. Cohill contended that it was not her blood and that she had no cuts or scrapes of any kind on her body when she went to work and that she did not cut herself or bleed on the biscuit. Despite this change in her testimony, both Hilda Bryant and Annetta Cohill concede that when Hilda Bryant inspected the employees, she was required to bandage Ms. Cohill on her arm, and that this bandage was put on her arm on the morning in question. This was done prior to Ms. Cohill being sent home early.
"A typical example of Ms. Cohill's testimony is [as follows]:
"`Q. You told me just a minute ago that you told me on the phone that you might have cut your hand, it was your blood
"`A. I said I could have cut myself. I don't know.
"`Q. Ms. Cohill, let me make sure I understand. I asked you do you know anything about a biscuit and your response to that question was you could have cut yourself, right?
"`A. Yes.
"`Q. Might have been your blood?
"`A. I said it could have been my blood.
"`Q. `Could have been my blood.' Okay. And at least today you are admitting that they sent you home early?
`"A. Well, that's what I thought, they had sent me home early or I went home early.'
"Plaintiff would note that this testimony shows that Ms. Cohill's immediate response to the question, `do you know anything about a bloody biscuit,' was that, `she could have cut herself,' and, `it might have been my blood.' She then goes on to admit that after her `realization' that she had been talking to Davis's attorney, she is now certain that she did not cut herself and it was not her blood.
"Ms. Cohill admitted that on the morning in question, it was her job to prepare the biscuits and gravy for the customers to pick up. As noted above, the jury was made aware of the fact that Hardee's did not provide Ms. Cohill's name to Davis until approximately ninety (90) days before *1138 trial, even though they had records which would have clearly shown that Ms. Cohill was employed as a cook preparing breakfast on the morning in question. Annetta Cohill also testified that it was common for her to be sent home early if Hardee's was not busy, however, her time record clearly showed that in the six (6) months she was employed at Hardee's, prior to the date in question, she had only been sent home early two times, and on one of those dates she actually had worked her five hours.
"To have full appreciation of the jury's interpretation of Ms. Cohill's testimony, it is necessary to also consider the testimony of certain co-employees with regard to the events that occurred on the morning of November 30, 1993. Hilda Bryant, the breakfast manager, testified that on the morning in question she received the call from Ms. Davis and that she proceeded to inspect all of the employees. Although Ms. Bryant claims that she saw no one that was cut, she admits that she bandaged a place on Ms. Cohill's arm. (Remember, Annetta Cohill testified she had no cuts or scrapes on her when she went to work.) Furthermore, Ms. Bryant admits that Annetta Cohill was sent home early on the morning in question. In ... Flagstar's brief, Flagstar makes a candid admission that Hilda Bryant, knowing that the health inspector would be in, and wanting to be on the `safe side' placed a band-aid on Annetta Cohill's arm.
"Finally, one of the most devastating moments of testimony from Flagstar's perspective was from one of their own witnesses, Evelyn Kelley. After contending throughout the trial that Annetta Cohill was sent home early on a regular basis (which the records proved was not true), and after parading a number of co-employees up to talk about how busy it was that morning, defense witness Evelyn Kelley candidly testified as follows:
"`Q. Do you remember anybody being sent home early that day?
"`A. Unh-unh. It was so busy, I didn't remember nobody going home.

"`Q. Pretty busy morning that morning?

"`A. Uh-huh.

"`Q. So you wouldn't think anybody would be sent home because you were so busy?
"`A. Yeah.'
"Davis called as her expert witness Dr. George Shaw, a professor of medicine at the University of Alabama at Birmingham (`UAB'), in the Division of Hematology and Oncology. Dr. Shaw is the deputy director of the UAB Center for AIDS Research. Dr. Shaw's role as the deputy director of the UAB Center for AIDS Research is developing research and experience in a problematic effort in the clinical science of HIV infection and its linkage to basic science. Dr. Shaw's emphasis is in trying to understand the underlying disease process in humans as a result of infection by the HIV virus. Dr. Shaw testified by videotape deposition at the trial that there are several potential routes for HIV and hepatitis transmission. Dr. Shaw testified that HIV can be transmitted from an infected individual to an [uninfected] individual through sexual transmission, blood products, through needle sticks (either inadvertent by health care workers or through I.V. drug users); from mother to baby (either through the birth canal involving oral ingestion of amniotic fluid); and there are cases of HIV transmission through breast feeding [sic]. Dr. Shaw also gave other examples of oral ingestion being a route of exposure for HIV and hepatitis infection.
"After being qualified as an expert and after reviewing the facts of the present case, Dr. Shaw testified that in his opinion it was possible to transmit the HIV virus through the oral route. It is also possible to transmit the hepatitis viruses via the oral route.
"It was Dr. Shaw's opinion that Ms. Davis, having ingested human blood, was at risk for HIV and hepatitis transmission. Finally, and most importantly, Dr. Shaw testified that if all of the parties in this potential exposure were known, it would be very important to test both Ms. Davis and the individual that purportedly bled into the meal for both hepatitis and HIV for *1139 several very important reasons. Primarily, it would be important to know whether or not the person who bled into the meal was HIV antibody positive at the time of the exposure because if he were, you would know that there was a risk that the person had been exposed to the virus. On the other hand, if the person was negative for hepatitis and/or HIV, they could have reassured Davis that the chances were far less that she had been exposed to the HIV virus and with regard to hepatitis treatment would begin immediately."
(Citations to the record omitted; emphasis by Davis.)
The trial court denied Flagstar's motion for a judgment as a matter of law made before submission of the case to the jury and later denied its motion for a judgment as a matter of law made after the verdict. It is those rulings that form the basis for Flagstar's appeal.[2]
With respect to the negligence claim, Flagstar contends that Davis failed to present any evidence that the Hardee's restaurant breached a duty with respect to the manner in which its employee or employees had prepared her food. Specifically, Flagstar argues:
"First, Davis failed to present any evidence regarding industry standards for the preservation and preparation of food. Davis also failed to present any evidence of industry standards regarding protective measures to be taken by employees who are cut or injured on the job.
"Not only did Davis fail to present evidence demonstrating what duty Hardee's owed her, but she also failed to present any evidence that Hardee's breached any duty it owed to her. For example, Davis presented no evidence demonstrating that a Hardee's employee or manager failed to follow any standard promulgated by Hardee's for the safe preparation of food or for injured employees. Furthermore, Davis presented no evidence that any standard promulgated by Hardee's violated or failed to meet any industry standard with regard to food preparation or injured employees.
"....
"In sum, Davis has failed to present substantial evidence as to each element of her negligence claim. Specifically, there was a complete failure of proof as to what duty Hardee's owed and how Hardee's breached said duty. Furthermore, any conclusion that Hardee's was negligent would be based solely on speculation or conjecture. Therefore, the verdict must be set aside and this cause must be remanded to the trial court with appropriate instructions."
Davis contends that she presented sufficient circumstantial evidence of each element of her negligence claim to submit that claim to a jury. Based on our review of the evidence, we conclude that it was sufficient to create a jury question with respect to the negligence claim. It is well established that there are three essential elements to a right of recovery for negligence: 1) a duty owing from the defendant to the plaintiff; 2) a breach of that duty; and 3) an injury to the plaintiff in consequence of that breach. Stokely-Van Camp, Inc. v. Ferguson, 271 Ala. 120, 122 So.2d 356 (1959); South Coast Properties, Inc. v. Schuster, 583 So.2d 215 (Ala.1991). It cannot be seriously disputed that the restaurant owed a duty to Davis to exercise reasonable care in the preparation and packaging of her food, i.e., that it had a duty to sell her merchantable food or food that was not unreasonably dangerous. In McCarley v. Wood Drugs, Inc., 228 Ala. 226, 227, 153 So. 446, 446 (1934), this Court stated:
"Plaintiff's cause proceeded to trial upon counts 1 and 4, which, as a basis for recovery, rest upon the negligence of defendant in failing to exercise a proper degree of care in the selection and preparation of the food served to her in defendant's place of business. Such degree of care has been here defined as follows: `The law requires that, in the selection of the food for his restaurant and in cooking it for his customers, he shall exercise that same degree of *1140 care which a reasonably prudent man, skilled in the art of selecting and preparing food for human consumption, would be expected to exercise in the selection and preparation of food for his own private table.' Travis v. Louisville & Nashville R.R. Co., 183 Ala. 415, [424,] 62 So. 851, 854."
A Hardee's employee would certainly take reasonable steps so as not to allow his or her own food to become contaminated with human blood, and a Hardee's customer certainly would not reasonably expect to find human blood in a biscuit with gravy, a fact conceded by Flagstar. See Cain v. Sheraton Perimeter Park South Hotel, 592 So.2d 218 (Ala.1991), discussing the "reasonable expectation" test adopted by this Court in Ex parte Morrison's Cafeteria of Montgomery, Inc., 431 So.2d 975 (Ala.1983). The evidence, viewed in the light most favorable to Davis, indicated that Davis purchased a biscuit with gravy from the Hardee's restaurant; that that biscuit with gravy was contaminated with human blood; that Annetta Cohill, a Hardee's employee, was primarily responsible for preparing Davis's food on the morning in question; that Cohill's supervisor had to bandage Cohill's arm on that same morning;[3] that Cohill's supervisor sent her home before her shift was over, even though the restaurant was busy with customers; and that no one outside the restaurant who came into contact with the food (Eric Cohill) or in close proximity to it (customers paying for gasoline at the store's counter) had a reasonable opportunity to bleed into the styrofoam container. A jury could reasonably infer from this evidence that Annetta Cohill failed to exercise reasonable care in packaging Davis's food, either by failing to properly bandage a cut or abrasion on her arm or by failing to observe that blood had gotten onto the styrofoam container, and that Davis suffered emotional distress as a result of eating blood-tainted food.[4] We hold, therefore, that *1141 the trial court properly denied Flagstar's motion for a judgment as a matter of law on Davis's negligence claim.[5]
As to the AEMLD claim, Flagstar concedes, as previously noted, that a consumer would not reasonably expect to find *1142 human blood in food purchased from a restaurant and, therefore, that food contaminated in such a manner would be "defective" within the meaning of the AEMLD. For a discussion of the AEMLD in the context of allegedly defective food served by a restaurant, see Cain v. Sheraton Perimeter Park South Hotel, supra. Flagstar contends, however, that Davis failed to present sufficient evidence that the biscuit with gravy left the restaurant's control in an unreasonably dangerous or defective condition. Flagstar also contends that "the evidence conclusively demonstrates that the product was substantially changed from its original condition." These two contentions appear to be based on Flagstar's belief that the evidence conclusively established that the styrofoam package containing the biscuit with gravy was contaminated by someone after it was taken from the restaurant by Eric Cohill. Suffice it to say that the evidence presents a question of fact for a jury as to whether the food could have been contaminated after it was taken from the restaurant. We hold, therefore, that the trial court properly denied Flagstar's motion for a judgment as a matter of law with respect to the AEMLD claim.
Wantonness is "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code 1975, § 6-11-20(b)(3). Flagstar contends that Davis's evidence was not of such quality and weight that a jury of reasonable and fair-minded persons could find that evidence "clear and convincing" on Davis's claim that an employee or employees of the Hardee's restaurant had deliberately engaged in conduct that was in reckless or conscious disregard of the safety of the restaurant's customers. See Ex parte Norwood Hodges Motor Co., 680 So.2d 245 (Ala.1996). Davis, of course, takes the contrary position, arguing primarily that she presented evidence from which a jury could reasonably infer that employees of the restaurant, and Flagstar itself, failed to fully cooperate with Davis following the incident and could infer that a "cover up" had been undertaken in an attempt to avoid liability. After carefully examining the evidence, we conclude that Davis presented insufficient evidence to submit the wantonness claim to a jury. We hasten to point out again that in reviewing the evidence we have indulged all reasonable inferences in favor of Davisconsidering the evidence exactly as Davis set it out in her brief. Although we agree with Davis that a reasonable person might conclude from the evidence that employees of Hardee's and Flagstar took evasive measures to hinder and possibly "cover up" the investigation into the incident by the health department and Davis's attorney, that evidence, standing alone, in no way indicates that on November 30, 1993, Annetta Cohill, or any other employee of Hardee's, deliberately engaged in conduct (preparing food) in reckless or conscious disregard for the safety of the restaurant's customers. The evidence of a "cover up" of what may have been negligence on the part of Annetta Cohill in packaging Davis's food cannot logically support a finding of wantonness and a consequent assessment of punitive damages. A conclusion based solely on conjecture or speculation cannot serve as a proper basis for a jury verdict. South Coast Properties, Inc. v. Schuster, supra. Therefore, we are constrained by our standard of review to hold that, with respect to the wantonness claim, the trial court erred in denying Flagstar's motions for a judgment as a matter of law. Because Flagstar challenged the sufficiency of the evidence to support the wantonness claim and because the wantonness claim constituted a "bad count" within the meaning of Aspinwall v. Gowens, 405 So.2d 134 (Ala. 1981), we reverse the judgment and remand the case for further proceedings consistent with this opinion.[6]
REVERSED AND REMANDED.
*1143 HOOPER, C.J., and MADDOX, KENNEDY, and SEE, JJ., concur.
ALMON, SHORES, and COOK, JJ., dissent.
COOK, Justice (dissenting).
I respectfully dissent. I would hold that sufficient evidence existed to submit the wantonness claim to the jury.
I agree with the majority that evidence offered to prove that employees of Hardee's and Flagstar subsequently attempted to "cover-up" the investigation into the incident does not indicate that any employees engaged in conduct in reckless or conscious disregard for the safety of Hardee's customers. However, the conduct of Hardee's employees prior to the incident has a direct bearing on the sufficiency of the evidence with respect to the wantonness claim. On two occasions, Annetta Cohill stated under oath that she may have cut herself and that it may have been her blood in the styrofoam container in question. During cross-examination at trial, "substantial portions of the [Annetta Cohill] deposition [were] read to her and placed into the record without objection by Flagstar. Particularly, Annetta Cohill admitted in her deposition testimony and in her trial testimony, under oath, that when Davis's counsel inquired as to whether or not she had information with regard to the bloody biscuit, her first response was, `I could have cut myself,' [and] `It might have been my blood,' and that her supervisor, Hilda Bryant, sent her home early on that day." (Appellee's brief at 12.) (Citations to the record omitted; emphasis added.) These statements were made by Cohill to Davis's attorney when Cohill believed she was speaking *1144 with an attorney for Hardee's. Not only did Cohill admit during her sworn deposition testimony that she had made the statements to Davis's attorney in a telephone conversation, but she also admitted the same at trial. It was not until after Cohill realized that she was not talking to a Hardee's attorney that she stated that she did not cut her hand and that it could not have been her blood in the biscuit. If the jury believed, and apparently it did, that Cohill knew she was bleeding and that her blood may have gotten into the styrofoam container, yet continued to work and package biscuits and gravy for customers, then the jury could have found that Cohill's conduct occurred with a reckless or conscious disregard for Hardee's customers, including Davis.
Furthermore, at no time during trial did Flagstar object to the testimony of Annetta Cohill. In fact, Flagstar failed to request, in regard to Cohill's testimony, a limiting instruction specifying that the testimony could be used for impeachment purposes only. Therefore, Flagstar failed to properly preserve this argument for appeal.
I agree with the majority that the plaintiff's evidence was sufficient to support the negligence and AEMLD claims. However, based on the fact that Cohill stated under oath on two occasions that she might have cut herself and that it might have been her blood in the biscuit, I dissent from the holding that the plaintiff's evidence was insufficient on the wantonness claim. I would affirm the judgment.
ALMON and SHORES, JJ., concur.
NOTES
[1] See Rule 50, Ala.R.Civ.P. Such a motion was formerly known as a motion for a directed verdict, when it was made before submission of the case to the jury, and as a motion for a judgment notwithstanding the verdict, when it was made after an unfavorable verdict.
[2] In addition to challenging the sufficiency of the evidence to support Davis's claims, Flagstar also contends that the verdict was against the weight of the evidence. In light of our holding on the sufficiency issue, we pretermit any discussion of the weight-of-the-evidence issue.
[3] There was testimony indicating that the supervisor had bandaged an old scab on Cohill's arm as a precautionary measure only, not out of any concern that it may have been bleeding. The credibility of this testimony and the weight to which it is entitled in deciding this case are matters reserved to the jury.
[4] We note that our holding in this respect is not based on the doctrine of res ipsa loquitur. In McCarley v. Wood Drugs, Inc., supra, this Court noted:

"[In] Hooper Cafe Co. v. Henderson, [223 Ala. 579, 137 So. 419 (1931)], it was noted that the case of Sheffer v. Willoughby, 163 Ill. 518, 45 N.E. 253, 34 L.R.A. 464, 54 Am.St.Rep. 483, cited approvingly in Travis v. L. & N.R.R. Co., [183 Ala. 415, 62 So. 851 (1913)], held, in effect, that proof that plaintiff ate the food, and in consequence became sick, did not make out a prima facie case of negligence, nor shift the burden to defendant, and this holding was approved, with the concluding observation, that negligence or breach of duty is not to be presumed.
"Measured by the rule of these decisions, now firmly established in this jurisdiction, the trial court correctly ruled in giving the affirmative charge in favor of the defendant.
"The evidence is not voluminous and has been duly considered by the court in consultation, and we find it was sufficient from which the jury might reasonably infer plaintiff's sickness was in some manner produced by the food served her in the purchased lunch. But this alone will not suffice for the submission of plaintiff's case to the jury. There must be some fact or circumstance from which a reasonable inference may also be drawn that defendant failed in the proper degree of care in the selection or preparation thereof.
"Of course, as insisted by counsel for plaintiff, negligence may be inferred from circumstances (Lawson v. Mobile Electric Co., 204 Ala. 318, 85 So. 257), and direct acts need not be shown, but proof must nevertheless be adduced from which a reasonable inference of negligence may be drawn. It was so adduced in Hooper Cafe v. Henderson, supra, where fish with an unpleasant odor and taste was served with the added proof that spoiled fish may be readily detected by the senses of sight, touch, and smellall of which justified the inference of negligence on the defendant's part. And in Travis v. L. & N.R.R. Co., supra, proof was offered as to the oysters served, upon which negligence might be reasonably inferred; and in Pantaze v. West, 7 Ala.App. 599, 61 So. 42, 44, cited by appellant, where plaintiff became sick from eating tainted brains, proof was adduced showing that such condition was easily detected, and that in fact the harmful effects might be removed by proper cooking. The court observed: `The inferences that might easily and reasonably be drawn from this evidence, it seems to us, are that, if the plaintiff was made sick from eating tainted brains, the defendant or his servants, for whose acts the defendant is liable, were negligent either in not using due care in properly cooking the brains or in failing to discover that they were tainted or in an unfit and dangerous condition to cook and serve to patrons for consumption; for it was established by the testimony that the taint was easily and readily detected by any one giving ordinary attention to the matter, and a want or failure to observe this duty and exercise due care in this regard would constitute that negligence for which the defendant would be held liable.'
"In the instant case there was no proof of peculiar or unpleasant odor or taste as to the food consumed, nor anything to indicate that it was in any manner improper for human consumption. Plaintiff rests her case upon proof tending to show sickness in consequence of the food consumed. But, as previously stated, this will not suffice for submission of the matter of defendant's negligence for the jury's determination."
228 Ala. at 227-28, 153 So. at 447. As previously stated, the evidence in the present case suggested that the blood was clearly visible inside the styrofoam container and that it could have been readily detected by Cohill if she had been exercising reasonable care at the time she packaged Davis's food.
Citing a number of cases from other jurisdictions, Flagstar also contends that, as a matter of law, Davis should not be allowed to recover damages based on allegations that she suffered emotional distress arising out of a fear of contracting HIV, the virus that causes AIDS (acquired immune deficiency syndrome). The record indicates that Flagstar tried its case below on the theory that Davis had failed to prove each of the elements of her claims, not on the theory, presented here for the first time, that as a matter of law she could recover no damages for emotional distress. Characterizing Davis's assertions of emotional distress as "AIDS phobia," Flagstar argues that it was entitled to a judgment as a matter of law on the ground that Davis suffered no injury as the result of eating blood-tainted food. We find it unnecessary to reach this issue because, in our view, it constitutes a new theory that was not raised in the trial court. Relying on Beavers v. County of Walker, 645 So.2d 1365 (Ala.1994), Flagstar takes the position that it preserved the issue for appellate review by making the general argument that the evidence was insufficient to submit the negligence claim to a jury. This Court did recognize in Beavers that the rule requiring adherence to the theory relied on in the trial court does not mean that the parties are limited on appeal to the same reasons or arguments advanced in the trial court upon the matter or question in issue. 645 So.2d at 1372. However, the rule remains that a party may not change theories on appeal in an attempt to set aside the judgment. This Court, in First National Bank of Pulaski, Tenn. v. Thomas, 453 So.2d 1313 (Ala.1984), implicitly rejected the notion that a general motion challenging the sufficiency of the evidence is sufficient to preserve for appellate review every theory that might be relied on to support the motion. One of the issues in that case concerned whether the bank had trespassed on the plaintiffs' property. At trial, the bank took the position that it had had permission to send one of its representatives onto the plaintiffs' property; therefore, according to the bank, the evidence was insufficient to show that it had committed a trespass. On appeal, however, the bank argued that no trespass had occurred because it had a right under its mortgage to enter onto the plaintiffs' property. This Court stated:
"The assertion now, for the first time, that the Bank as mortgagee had a right to enter upon plaintiffs' premises raises a theory which we cannot consider. Dixie Highway Express, Inc. v. Southern Railway Co., 286 Ala. 646, 244 So.2d 591 (1971). Having permission or consent to enter upon the land, on the one hand, and having the right as mortgagee to enter upon that land, are obviously inconsistent and different theories. Having permission or consent implies that plaintiffs had the right to control the Bank's entry, while having the right to enter the land as mortgagee implies a right of entry not dependent upon permission or consent of the plaintiff mortgagors. Having tried its case below on the theory of consent, the Bank cannot now pursue the new theory of entrance by right as mortgagee."
453 So.2d at 1319.
[5] We note, as Flagstar points out, that there is no cause of action in Alabama for the negligent infliction of emotional distress. Implied in our holding in Allen v. Walker, 569 So.2d 350 (Ala. 1990), a case involving allegations of verbal abuse and threats of physical violence, is the idea that one cannot negligently "inflict" emotional distress on another. The American Heritage Dictionary of the English Language (1969), defines "inflict" as follows: "1. To cause or carry out by physical assault or other aggressive action. 2. To impose.... 3. To afflict." Accordingly, this Court has recognized that only the intentional infliction of severe emotional distress is actionable as a separate tort. However, the present action is based on allegations that a Hardee's employee negligently packaged Davis's food and that that negligence resulted in Davis's suffering emotional distress. Damages for emotional distress may be awarded in a negligence case, even in the absence of physical injury. Taylor v. Baptist Medical Center, Inc., 400 So.2d 369 (Ala. 1981). See, also, Reserve National Ins. Co. v. Crowell, 614 So.2d 1005, 1011 (Ala.1993), cert. denied, 510 U.S. 824, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993), wherein this Court recognized the difference between a claim alleging negligent infliction of emotional distress and a claim not based on infliction of emotional distress, but pursuant to which damages for emotional distress may nonetheless be awarded.
[6] We note that in considering the question of the sufficiency of the evidence with respect to the negligence and wantonness claims, we have not considered as substantive evidence Annetta Cohill's testimony that she "could have" cut herself or that the blood "might have been" hers. That testimony was admissible at the trial for impeachment purposes after Cohill had denied that the blood could have been hers, and Flagstar concedes as much; however, it could be considered as substantive evidence only if the statements had been made in an appropriate proceeding at which Cohill was under oath and was subject to being penalized for perjury. See Rule 801(d)(1), Ala.R.Evid., which provides:

"Statements That Are Not Hearsay. A statement is not hearsay if
"(1) Prior Statement by Witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition...."
See, also, Patrick v. Femco Southeast, Inc., 590 So.2d 259 (Ala.1991); and C. Gamble, McElroy's Alabama Evidence, § 159.02(1) (5th ed.1996):
"A self-contradictory statement by a witness who is not a party, whether testified to by the witness during questioning or proven extrinsically by others, generally is not substantive evidence of the matter asserted. The statement customarily operates only to impeach or discredit the witness and has no other effect; in particular, such statement cannot be the basis of a finding of fact necessary to the establishment of civil or criminal liability or a defense to either.
"....
"With the advent of the Alabama Rules of Evidence, however, at least some inconsistent statements constitute substantive evidence as to the truth of the matter asserted in them. When a witness, for example, testifies at a trial or hearing and is subject to cross-examination then that witness' prior inconsistent statement is admissible as substantive evidence if it was given under oath subject to penalty of perjury at a trial, hearing, other proceeding or in a deposition. This particular rule of admissibility had been embraced by the Alabama courts before adoption of the Alabama Rules of Evidence. A statement qualifies [as substantive evidence] under [Rule 801(d)(1)(A)] only if: 1) it is inconsistent with the witness' present testimony; 2) the witness is subject to cross-examination; and 3) the statement was given in an appropriate proceeding. Appropriate proceedings include such proceedings as hearings before a grand jury, prior trials and depositions. When a prior inconsistent statement is offered for substantive proof of its contents under the present principle, the offering party is due an instruction that it is usable both as going to the credibility of the witness and as substantive proof of the matter asserted."
Davis argues that because Cohill admitted under oath in her deposition and at trial that she had made the statements to Davis's attorney in a telephone conversation over two years after the incident, Rule 801(d)(1) is satisfied and the statements should be considered as evidence that Cohill could have cut herself and that she could have gotten blood in the container. The rule is clear, however, and it requires that the statement one seeks to have admitted have been made under oath at an appropriate proceeding. Testifying under oath that she had made the statements to Davis's attorney is not the same as making the statements under oath. The rule contemplates that a statement is more reliable if it was made under oath, with the declarant subject to penalty for perjury. Stretching the rule in the way Davis suggests would tend to remove the prophylactic effect of that requirement.
In any event, we note that even if we were to consider the statements as substantive evidence, they in no way indicate that Cohill engaged in wanton conduct while preparing Davis's food.