751 So.2d 494 (1999)
ALABAMA POWER COMPANY
v.
Garrett MURRAY and Fragil Murray.
1971174.
Supreme Court of Alabama.
August 6, 1999.
Rehearing Denied November 19, 1999.
*495 William P. Cobb II and Martin E. Burke of Balch & Bingham, L.L.P., Montgomery; and Sydney S. Smith of Smith & Smith, P.C., Phenix City, for appellant.
W. Banks Herndon and Patrick O'Neal Miller of Loftin, Herndon, Loftin & Miller, Phenix City, for appellees.
COOK, Justice.
Alabama Power Company ("APCo") appeals from a judgment entered on jury verdicts in favor of the plaintiffs, Garrett Murray and Fragil Murray. We affirm in part and affirm conditionally in part.
In the early morning hours of October 6, 1994, the Murrays were awakened by the sound of a loud boom from APCo's Seale Road substation near the Murrays' home. The Murrays noticed that the power to their home was out, and they then went back to sleep. Not long after that, the Murrays were awakened by a sound in their house and discovered that the house was on fire. The Murrays and their children were able to escape, but the house was destroyed by the fire.
The Murrays sued APCo, alleging that APCo had negligently caused a "surge" of electrical power from APCo transmission lines to come into the electrical circuitry of the Murrays' home and cause the fire that destroyed their home. The Murrays claimed no physical injury, but alleged that, as a result of APCo's alleged negligence, they had suffered mental anguish and a property loss totalling $35,989.27. APCo answered, denying negligence and asserting contributory negligence on the part of the Murrays.
The jury returned a $150,000 verdict for each plaintiff. The trial court denied APCo's postjudgment motions requesting a JNOV; a new trial; a remittitur of the damages awards; and an order altering, amending, or vacating the judgment, and it entered a judgment on the jury verdicts. APCo appealed.
The Murrays' negligence claim against APCo was based on their contention that a massive power surge (in excess of 200,000 volts) developed on APCo lines, passed through the Seale Road substation, bypassed the "surge arrester" on APCo's lines, bypassed the "ground field" at the substation, and passed into the circuitry of the Murrays' home. The Murrays alleged that APCo had negligently failed to install sufficient surge arresters, and that that negligent failure allowed the surge to travel unimpeded into the Murrays' home.
APCo denied that a 200,000-volt power surge had occurred. It claimed that the Seale Road surge arrester was defective; and it contended that it was coincidental that the Murrays' house caught fire not long after they had heard a boom from the nearby APCo substation.
Later on the day of the fire, the porcelain surge arrester that APCo alleged had failed was unbolted from its site, but it was somehow dropped and was destroyed. At trial, Jeff Roper, an APCo engineer, testified:
"Q. Now, this surge arrester that [APCo] says was defective, somebody from [APCo] on October 6 went out there with some wrenches and things and climbed up there after all the power had been killed and unscrewed the nuts and bolts that held that surge arrester in place; is that right?
"A. That is correct.
"Q. And then, unfortunately, I guess, as [APCo] folks were taking that *496 surge arrester down, it slipped out of their hands and fell to the ground 14 feet below and shattered and that was the end of it?
"A. That is correct.
"Q. So nobody had a chance to look at it after it was taken down; is that right?
"A. That is correct."
The following deposition testimony of Bill Obert, another APCo engineer, was then read to Mr. Roper:
"Q. Were you present when the lightning [surge] arrester was taken down?
"A. I don't remember right offhand. I cannot remember.
"Q. Did you ever look at the lightning arrester after it had been taken down?
"A. It seems like, yes, I did. I did see it. That is after it was taken down. I might have been back that afternoon, because, I think, you know, they were still doing some work in the substation.
"Q. All right. Did you see anything when you looked at the lightning arrester that was abnormal or unusual?
"A. No. From my recollection, you know, it looked okay."
Jeff Roper was then asked:
"Q. Now, Mr. Roper, can you explain to the jury that if this arrester was shattered in many pieces when it fell to the ground, how Mr. Obert could have seen it later that afternoon and found it to be okay?
"A. I don't know. It was shattered.
"Q. Do you have any idea where that surge arrester is today?
"A. No, sir.
"Q. If we had the surge arrester today, and if it wasn't shattered, then we could have engineer types look at it and analyze it and tell the jury for sure whether it was defective or faulty or not, couldn't we?
"A. I think so.
". . . .
"Q. Did anybody with [APCo] make any photographs of the surge arrester that the power company says was defective?
"A. No, sir.
". . . .
"Q. You understand that the Murrays' house right across the street and down about 100 yards caught fire on the morning of October 6, 1994, at just about the same time that this problem occurred at the substation, correct?
"A. Yes, sir.
"Q. And is it your testimony to this jury that those in your opinion were just simple coincidences; that they just happened to occur at the same time and they are not related to each other at all?
"A. That is correct."
Using language from Alabama Pattern Jury Instructions: Civil, 15.13 (2d ed., 1998 cum. supp.), the trial court charged the jury (the differences from instruction 15.13 are bracketed here):
"In this case, the [Murrays claim] that the defendant [Alabama Power Company] is guilty of wrongfully destroying, hiding, concealing, altering, or otherwise wrongfully tampering with [the] material evidence[, namely, the surge arrester at the Seale Road substation]. If you are reasonably satisfied from the evidence that [Alabama Power Company] did or attempted to wrongfully destroy, hide, conceal, alter, or otherwise tamper with material evidence, then that fact may be considered as an inference of [Alabama Power Company's] guilt, culpability, or awareness of the defendant's negligence."
APCo maintains that the court erred in giving this instruction. According to APCo, although it denied that a power *497 surge had occurred on its lines at the time the Murrays' house caught fire, its witnesses admitted at trial the very facts that the Murrays would need to prove that a power surge had passed through the surge arrester. These admissions, says APCo, prove that it lacked the intent to "wrongfully destroy, hide, conceal, alter, or otherwise wrongfully tamper with material evidence, namely the surge arrester at the Seale Road substation," and that it did not take advantage of the fact that its employees saw the surge arrester after the fire and the Murrays' experts did not.
APCo points out that one of its engineers stated that APCo did not "look into" the possible cause of a defect in the Seale Road substation's surge arrester because, when arresters had been defective in the past, APCo had simply replaced them and had not had them testedbecause, the engineer said, "[i]t wasn't anything we felt like we needed to do." APCo contends that this testimony, in light of APCo's admissions that would allow a fact-finder to infer that the surge arrester had had a defect, made it error to give a jury charge on the wrongful destruction of evidence. We disagree.
Although a trial court is vested with considerable discretion in charging a jury, the parties before it have the right to a jury that has been properly instructed as to the standard to be applied to the evidence. Thus, "[a]n incorrect, misleading, erroneous, or prejudicial charge may form the basis for granting a new trial." Shoals Ford, Inc. v. Clardy, 588 So.2d 879, 883 (Ala.1991).
In May v. Moore, 424 So.2d 596 (Ala. 1982), this Court held:
"Proof may be made concerning a [party's] purposefully and wrongfully destroying a document which he knew was supportive of the interest of his opponent, whether or not an action involving such interest was pending at the time of the destruction. See Gamble, McElroy's Alabama Evidence § 190.05 (3d ed.1977). Additionally, the spoliation, or attempt to suppress material evidence by a party to a suit, favorable to an adversary, is sufficient foundation for an inference of his guilt or negligence. Southern Home Insurance Co. of the Carolinas v. Boatwright, 231 Ala. 198, 164 So. 102 (1935); see also Gamble, McElroy's Alabama Evidence § 190.02 (3d ed.1977)."
424 So.2d at 603.
The Murrays contend that evidence regarding the condition of the surge arrester was vital to their case against APCo. Further, claim the Murrays, APCo knew, when it was removing the surge arrester, that the Murrays' potential claim against it depended, in part, on the condition of the surge arrester; thus, they say, the Seale Road surge arrester was evidence that APCo "knew was supportive of the interest of [its] opponent[s]."
These contentions, say the Murrays, when viewed in the context of the inconsistent testimony of Jeff Roper and Bill Obert and the statements of the Murrays' neighbors with regard to electrical appliances in their homes that they say were destroyed as a result of the same power surge, provided a sufficient foundation for the jury charge on the doctrine of spoliation. See Campbell v. Williams, 638 So.2d 804 (Ala.1994). Alabama Pattern Jury Charge 15.13 requires that the fact-finder be reasonably satisfied from the evidence that spoliation has occurred. The record contains sufficient evidence to support the trial court's giving this charge and allowing the jury to determine whether that evidence also supported a reasonable inference of APCo's "guilt, culpability, or awareness of [its] negligence."
Based on what it contends are facts to support such a holding, APCo next argues that this Court should adopt a new standard of proof for recovery of damages for mental anguish. Under the standard proposed by APCo, plaintiffs claiming damages for mental anguish suffered without accompanying physical injury would be *498 required to present "direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine." Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex.1995); Saenz v. Fidelity & Guaranty Ins. Underwriters, 925 S.W.2d 607 (Tex.1996).
This Court has written:
"Alabama, historically, did not permit the recovery of compensatory damages for emotional distress in a negligence action, absent some evidence of a corresponding physical injury. However, in Taylor v. Baptist Medical Center, Inc., 400 So.2d 369 (Ala.1981), this Court specifically rejected that long-standing rule, stating that `to continue to require physical injury caused by culpable tortious conduct, when mental suffering may be equally recognizable standing alone, would be an adherence to procrustean principles which have little or no resemblance to medical realities.' 400 So.2d at 374....
"... Although Taylor held, and Flagstar [Enterprises, Inc. v. Davis, 709 So.2d 1132 (Ala.1997),] recognized, that a physical injury is no longer a prerequisite to the recovery of damages for emotional distress in a negligence action, neither of those decisions was intended to establish a new and independent tort action for negligently inflicted emotional distress. Since Taylor, this Court has stated repeatedly that such an independent tort does not exist in Alabama.... [T]his Court has adhered to the principle that negligently causing emotional distress is not an independent tort in Alabama, but, rather, that it is part and parcel of the traditional tort of negligence.
". . . .
"However, ... we have recognized, since this Court's 1981 decision in Taylor, a right of recovery for mental or emotional harm (such as fright or anxiety) that is caused by the negligence of another and that is not directly brought about by a physical injury. Although Taylor represented a major departure from established Alabama law, it nonetheless brought Alabama into line with the majority of states; most states do not require the existence of a physical injury as a prerequisite to the recovery of damages for emotional distress. In Consolidated Rail Corp. v. Gottshall, 512 U.S. 532, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994), the United States Supreme Court, in determining the proper standard for evaluating claims for negligently inflicted emotional distress brought under the Federal [Employer's] Liability Act, ... surveyed the evolution of the common law right to recover damages for emotional distress in negligence cases:
"`. . . .
"`Three major limiting tests for evaluating claims alleging negligent infliction of emotional distress have developed in the common law. The first of these has come to be known as the "physical impact" test.... Under the physical impact test, a plaintiff seeking damages for emotional injury stemming from a negligent act must have contemporaneously sustained a physical impact (no matter how slight) or injury due to the defendant's conduct....
"`The second test has come to be referred to as the "zone of danger" test.... [T]he zone of danger test limits recovery for emotional injury to those plaintiffs who sustain a physical impact as a result of the defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct....
"`The third prominent limiting test is the "relative bystander" test.... [This test allows] bystanders outside of the zone of danger to obtain recovery in certain circumstances for emotional distress brought on by witnessing the injury or death of a third party (who typically must be a close *499 relative of the bystander) that is caused by the defendant's negligence.'
. . .
"512 U.S. at 544-49, 114 S.Ct. 2396.
"As noted, this Court in Taylor abandoned the `physical impact' test. This Court has, however, refused to extend liability so far as to recognize a right of recovery in bystanders. See Gideon v. Norfolk Southern Corp., [633 So.2d 453 (Ala.1994) ]. Taylor recognized the existing right to recovery for emotional distress for plaintiffs who have suffered a physical injury as the result of another's negligence, and it expressly extended the right to recovery to those who have suffered emotional distress without also suffering a corresponding physical injury. Implicit in the Taylor holding is a recognition that damages for emotional distress alone may be awarded in negligence cases where the evidence suggests that emotional distress may have resulted from culpable tortious conduct. Taylor contemplated a limited right of recovery in those whose emotional distress was reasonably foreseeable.... As these cases demonstrate, the current state of Alabama law is consistent with the `zone of danger' test discussed in Gottshall, which limits recovery for emotional injury to those plaintiffs who sustain a physical injury as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct."
AALAR, Ltd. v. Francis, 716 So.2d 1141 at 1144-47 (Ala.1998) (some citations omitted).
Under the standard proposed by APCo, a plaintiff claiming damages for mental anguish suffered without physical injury would be required to submit "direct evidence of the nature, duration, and severity of the claimed mental anguish of a sufficient magnitude to constitute a substantial disruption in the plaintiffs daily routine." APCo warns that the "zone of danger" test, without the evidentiary limitation APCo proposes, carries the potential for allowing recovery for emotional distress in cases where the plaintiffs are "seeking to recover for the angst caused by the `normal' stressors of lifea shaky airplane landing, witnessing an automobile collision, or a tipsy apartment tenant attempting to unlock the wrong door late at night." Rachel Giesber & Richard T. Stilwell, Standards Governing Recovery of Mental Anguish Damages Under Texas Law, 39 S. Tex. L.Rev. 45, 47 (1997).
Acknowledging APCo's concerns, we conclude, nevertheless, that, under the facts of this case, the Murrays' claims for mental anguish do not require a departure from the current standard for allowing recovery for damage or harm resulting from the negligent infliction of emotional distress. Clearly, the Murrays were inside the "zone of danger" when they awoke to find their home on fire and escaped through what they described as thick smoke and soot. After leaving their home, they stood in the street, in little clothing, watching as everything they owned burned.
Because the evidence would support a finding that the Murrays were within a zone of danger negligently created by APCo, and because they presented "some evidence of [their] mental anguish," the question whether to award them damages for emotional distress was one for the jury to answer in the exercise of its discretion as fact-finder. Kmart Corp. v. Kyles, 723 So.2d 572, 578 (Ala.1998); Alabama Power Co. v. Harmon, 483 So.2d 386 (Ala.1986). We decline to further limit the applicable "zone of danger" test under the circumstances presented by this case.
Finally, APCo contends that the jury could not properly make identical damages awards to the Murrays, in light of what APCo calls a "gross disparity in the evidence as to the nature, severity, and duration of the mental anguish allegedly suffered by each of them." APCo argues that the amount awarded to Mr. Murray exceeded an amount reasonably supported by the evidence of the nature, severity, *500 and duration of his mental anguish and, therefore, that the trial court should have ordered a remittitur of Mr. Murray's damages award.
The trial court charged the jury:
"The total amount of damages claimed by the plaintiffs [is] $35,989.27. As to the property damage, should you find for the plaintiffs, that would be the absolute maximum you could award in property damage for both plaintiffs. You cannot award each plaintiff that amount. If you find for the plaintiffs as to property, the maximum damage for both plaintiffs combined is $35,989.27. You may apportion that among the plaintiffs as you so desire, but the maximum can only be that amount. You cannot exceed that amount, total property damages.
". . . .
"The law has no fixed monetary standards to compensate for mental anguish. This element of damage is left to your good sound judgment and discretion as to what amount would reasonably and fairly compensate the plaintiffs for such mental anguish as you find from the evidence they did suffer.
"If you are reasonably satisfied from the evidence that the plaintiffs have undergone, or will undergo, mental anguish as a proximate result of the incident in question, you should award a sum which will reasonably and fairly compensate them for such mental anguish suffered by them, and for any mental anguish which you are reasonably satisfied from the evidence they are reasonably certain to suffer in the future."
With regard to the mental anguish suffered by Mrs. Murray, both Mr. and Mrs. Murray testified that she experienced hysteria and fainting on the morning of the fire, especially when Mr. Murray delayed coming out of the burning house, and both testified that she suffered severe symptoms of emotional distress after the fire. The evidence indicated that Mrs. Murray missed a week of work because her clothes had been destroyed; that she developed high blood pressure and a nervous condition following the fire, both of which require her to see a doctor and to take medicine; that before the fire she had been a student and that, although she had been an "A" student, after the fire she flunked out of school; that she developed problems with sleeping and at the time of the trial still had headaches and still cried about the fire. According to Mr. Murray's testimony, he thinks his wife will never be able to get over the effects of the fire.
The evidence of Mr. Murray's mental anguish, however, does not rise to the same level. He testified that he was "all shook up" the morning of the fire, and he said: "[A] man was living in a house with a family ... and lost everything in one night. And then he had to start all over again. Where is he going to start, without having money, clothes? It just was hard." Mrs. Murray testified that the fire had affected her more than it had affected her husband. Mr. Murray testified:
"Q. Has this fire caused you emotional problems?
"A. Yes.... Just at the time and how just when I think about it now, that my family could have been killed in that fire. The material things could be replaced, but what if I had been on third shift at work, and then that fire happened at that time of morning and my boys had been in their room? I thank God from this day that I was at home to wake them up. Not because of the material things, because I have some boys to see today."
The Murrays submitted an itemized statement indicating a $35,989.27 loss of personal property (they did not own the house). The jury returned verdicts for the Murrays in identical amounts ($150,000 each). APCo contends that these identical awards reflect an identical apportionment of damages between the Murrays$17,994.64 *501 each for loss of personal property and $132,005.36 each for mental anguish and that this apportionment of damages is not supported by the evidence. We agree.
The nature, severity, and duration of the mental anguish suffered by Mrs. Murray are clear, and the jury's award based on those factors is amply supported by the testimony of both Mr. and Mrs. Murray. The evidence of Mr. Murray's mental distress, however, did not indicate that his mental anguish was of the same nature or of the same severity or duration; therefore, we conclude that APCo is entitled to a remittitur of Mr. Murray's damages award to an amount commensurate with the evidence adduced at trial.
The judgment is affirmed insofar as it relates to Fragil Murray. Insofar as it relates to Garrett Murray, the judgment is affirmed on the condition that, within 14 days from the date of this opinion, he files with this Court a remittitur in the amount of $66,000, thus reducing his award from $150,000 to $84,000.
AFFIRMED IN PART AND AFFIRMED CONDITIONALLY IN PART.
HOOPER, C.J., and MADDOX, J., concur.
HOUSTON, J., concurs specially.
JOHNSTONE, J., concurs in part and concurs in the result in part.
SEE, LYONS, and BROWN, JJ., dissent.
HOUSTON, Justice (concurring specially).
I concur, relying on the majority opinions in Kmart v. Kyles, 723 So.2d 572 (Ala.1998), and Delchamps, Inc. v. Bryant, 738 So.2d 824 (Ala.1999).
JOHNSTONE, Justice (concurring in part and concurring in the result in part).
I concur with all aspects of the main opinion except the remittitur of Mr. Murray's damages. I concur only in the result of the remittitur of Mr. Murray's damages because I think we need to adopt the objective standard for remittiturs of damages for mental anguish that is proposed by my dissent in Delchamps, Inc. v. Bryant, 738 So.2d 824 (Ala.1999).
SEE, Justice (dissenting).
I dissent from the affirmance of the trial court's judgment. The evidence adduced at trial was not sufficient to support the trial court's giving the spoliation-of-evidence instruction with regard to the destruction of the surge arrester; thus, the trial court erred by giving that instruction to the jury over the timely objection of Alabama Power Company ("APCo"). That error prejudiced APCo and entitled it to a new trial. Accordingly, I would reverse the judgment and remand the case for further proceedings.
"`A party is entitled to proper jury instructions regarding the issues presented, and an incorrect or misleading charge may be the basis for the granting of a new trial.'" Cain v. Mortgage Realty Co., 723 So.2d 631, 633 (Ala.1998) (quoting Nunn v. Whitworth, 545 So.2d 766, 767 (Ala.1989)). "`Reversal is warranted only when the error is considered to be prejudicial.'" Id. (quoting King v. W.A. Brown & Sons, Inc., 585 So.2d 10, 12 (Ala.1991)).
It long has been the rule that for the spoliation-of-evidence doctrine to apply, there must be proof of a party's purposeful and wrongful attempted or actual destruction of, tampering with, or suppression of material evidence. See McCleery v. McCleery, 200 Ala. 4, 5, 75 So. 316, 318 (1917) (the spoliation-of-evidence doctrine was applicable where there was evidence tending to show that the defendant "had purposefully destroyed the [evidence] or had intentionally caused its destruction"); Buzbee v. Alabama Waste Services, Inc., 709 So.2d 61, 66 (Ala.Civ.App.1998) ("As noted by the trial court, `the doctrine of spoliation requires an active attempt to suppress or [to] destroy evidence. No *502 such evidence exists in this case.'") (alteration in original) (citing Christian v. Kenneth Chandler Constr. Co., 658 So.2d 408 (Ala.1995)); accord Vick v. Texas Employment Comm'n, 514 F.2d 734, 737 (5th Cir. 1975) ("The adverse inference to be drawn from destruction of records is predicated on bad conduct of the defendant. `Moreover, the circumstances of the act must manifest bad faith. Mere negligence is not enough, for it does not sustain an inference of consciousness of a weak case.'") (citation omitted); see also Charles W. Gamble, McElroy's Alabama Evidence § 190.05 (5th ed. 1996) ("Proof may be made that a party purposely and wrongfully destroyed a document which such party knew was supportive of an opponent's interest whether or not an action involving such interest was pending at the time of the destruction."); 29 Am.Jur.2d Evidence § 244 (1994) ("It is a general rule that the intentional spoliation or destruction of evidence relevant to a case raises a presumption, or, more properly, an inference, that this evidence would have been unfavorable. Such a presumption or inference arises, however, only where the act was intentional, and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent."). While the Murrays presented evidence tending to show that APCo employees accidentally or negligently destroyed the surge arrester while attempting to remove it, the Murrays presented no evidence tending to show that APCo purposely or intentionally destroyed the surge arrester to prevent it from being used as evidence against APCo.[1]
Moreover, the spoliation-of-evidence doctrine does not apply where the fact sought to be proved is proved by evidence other than the destroyed evidence. See Christian v. Kenneth Chandler Constr. Co., 658 So.2d 408, 412-13 (Ala.1995). In Christian, several party guests sued their hosts, Kenneth and Lee Chandler, for damages based on injuries they sustained at the Chandlers' home when a wooden deck the guests were standing on suddenly collapsed. The guests asserted claims of negligence, wantonness, and "spoliation of evidence." The morning after the deck collapsed, Kenneth Chandler photographed and videotaped the scene. Then, with the help of family and friends, he dismantled the collapsed deck and loaded the debris onto a truck. The debris was later hauled away and burned. This Court held that under the particular facts of the case, the spoliation-of-evidence doctrine did not apply. Id. at 413. This Court reasoned that the doctrine did not apply because the condition of the deck after it had collapsed was immaterial to the guests' claims. The relevant issue was the Chandlers' knowledge of the condition of the deck before it collapsed, and the condition of the deck before it collapsed was evidenced by an independent home inspector's report. Because the record contained no evidence indicating that the Chandlers had attempted to alter the inspection report or had asked the inspector to alter either the report or his testimony, *503 this Court concluded that there was an insufficient foundation for the spoliation-of-evidence doctrine. Id.
In Chandler, this Court distinguished two other cases involving spoliation of evidence, May v. Moore, 424 So.2d 596 (Ala. 1982), and Campbell v. Williams, 638 So.2d 804 (Ala.1994). This Court pointed out that in May and Campbell, both medical-malpractice cases, the plaintiffs presented evidence indicating that the defendant physicians had attempted to alter medical records to make them more favorable to the physicians. Unlike the defendant physicians in May and Campbell, Kenneth Chandler did not attempt to alter any material evidence. Instead, he recorded the physical appearance of the collapsed deck; thus, there was other evidence available to prove the condition of the deck before it collapsed.
In this case, the only purpose for which the Murrays needed to examine the surge arrester after the power surge occurred was to prove that it was not defective. However, the Murrays did not need to prove that the surge arrester was not defective in order to prove their theory of negligence against APCo which was premised on the allegation that APCo had failed to install an adequate number of surge arresters. Moreover, APCo did not assert an affirmative defense that a third party had negligently provided it with a defective surge arrester. Additionally, the fact sought to be proved by examination of the surge arresterthat a power surge had passed through itwas proved by other evidence. APCo admitted facts showing that the surge arrester was burned, that it had conducted electricity, that the surge arrester was intended to conduct electricity only in the case of a power surge, and that a power surge in excess of 200,000 volts would have burned the surge arrester.
Because the evidence was insufficient to show that APCo purposely and wrongfully destroyed or tampered with material evidence favorable to the Murrays, and because other evidence was available to show a power surge, the trial court improperly gave the spoliation-of-evidence instruction. I therefore dissent.
BROWN, J., concurs.
LYONS, Justice (dissenting).
I agree with Justice See's conclusion that Alabama Power Company is entitled to a new trial because the trial court erred in giving a jury instruction on spoliation. I join that portion of his opinion explaining why the condition of the arrester before it was destroyed was immaterial.
I write specially to state that I do not consider a spoliation instruction allowing an inference of wrongdoing from the destruction to be precluded every time the alleged spoliator makes a potentially self-serving claim of negligence. In such instances, the victim of spoliation should not be deprived of such an instruction merely upon the spoliator's asserting, "Oops, I dropped it." However, in order to overcome such an assertion by the alleged spoliator, the victim should do more than simply prove the occurrence of the destruction, as was the case here. The victim should, however, be entitled to a spoliation instruction upon adducing evidence that would be sufficient for the jury to infer the commission of an intentional actevidence such as the rarity of such an occurrence of destruction in the ordinary course of business; the frequency with which such a destruction occurs under circumstances that make a claim possible; inconsistencies in the testimony of those asserting that simple negligence caused the destruction; or other evidence challenging the credibility of the persons claiming the destruction was caused merely by negligence.
Even in instances where the circumstances surrounding the destruction of evidence suggest simple negligence, an instruction that is not so severe as to allow an inference of wrongdoing based on the fact of the destruction, but that shifts the *504 burden of proof, might be appropriate, especially where the plaintiff has satisfied all other elements necessary to defeat a motion for a judgment as a matter of law. See Welsh v. United States, 844 F.2d 1239, 1246 (6th Cir.1988), where the court recognized that "[d]estruction of potentially relevant evidence obviously occurs along a continuum of faultranging from innocence through the degrees of negligence to intentionality." The Welsh court then analyzed the resulting penalties that are possible dependent upon the circumstances of each case, going from nothing to a burden-shifting rebuttable presumption to an inference that the missing evidence would have been unfavorable to the spoliator. A burden-shifting instruction in the case of a merely negligent loss would not require the innocent party to suffer the consequences resulting from the fact that his or her burden of proof has been made greater by the negligence of the adversary, and, at the same time, it would not impose an excessively harsh sanction upon a merely negligent party.
NOTES
[1] The deposition testimony of APCo employee Bill Obert was read at trial during the direct examination of another APCo employee, Jeff Roper. I disagree that the jury could reasonably have found from that testimony that APCo purposely and wrongfully destroyed the surge arrester to prevent it from being used as evidence against APCo. Mr. Obert testified:

"Q. Were you present when the lightning [i.e., surge] arrester was taken down?
"A. I don't remember right offhand. I cannot remember.
"Q. Did you ever look at the lightning arrester after it had been taken down?
"A. It seems like, yes, I did. I did see it. That is after it was taken down. I might have been back that afternoon, because, I think, you know, they were still doing some work in the substation.
"Q. All right. Did you see anything when you looked at the lightning arrester that was abnormal or unusual?
"A. No. From my recollection, you know, it looked okay."
(R.T. at 92-93.) Mr. Roper testified that the porcelain surge arrester had fallen and shattered as APCo employees were attempting to remove it. (R.T. at 88, 91.)