Elisha Gooden, as personal representative of the estate of Tyrone Gooden, deceased, appeals from a summary judgment in favor of the City of Talladega and Daniel Dill in a wrongful-death action Elisha filed in the Talladega Circuit Court. We affirm.
 Facts and Procedural History
At approximately 3:30 a.m. on November 3, 2002, City of Talladega police officers Tony Haynes and Charles Courtney were on patrol when they encountered a black Ford Explorer sport-utility vehicle ("SUV") with an out-of-state tag. After noticing a broken taillight on the SUV, the officers requested the dispatch officer to "run" the tag in the National Crime Information Center ("NCIC") database, and the officers then turned on the blue lights on their patrol car to pull over the SUV. *Page 234 
However, the driver of the SUV, Tyrone Gooden, did not pull over. After traveling a short distance, Tyrone turned onto Alabama Highway 77 and proceeded north. The officers then turned on the siren, and Tyrone pulled the SUV over and came to a stop approximately 50 yards from the intersection of Highway 77 and Peters Road. The officers notified the dispatcher of the location of the stop, and the dispatcher informed them that the NCIC database was not then available.
When Officers Haynes and Courtney got out of the patrol car and began walking towards the SUV, three male passengers got out of the SUV. Courtney testified that he and Haynes told the passengers to get back in the SUV but that the passengers said they could not because the driver "was leaving." Tyrone, whose driver's license had been suspended, then took off in the SUV, again heading north on Highway 77. Officer Courtney testified that the SUV almost struck one of the former passengers as it was leaving.
As the SUV crossed Peters Road, it passed in front of the patrol car of Talladega police officer Daniel Dill. Dill did not know why Officers Haynes and Courtney had stopped the SUV, but he had watched the SUV pull over, and he saw two of the passengers get out as Officers Haynes and Courtney approached the SUV. Dill saw the SUV leave the scene, and when it passed in front of his patrol car, Dill turned on his blue lights and siren and began pursuing the SUV. Haynes and Courtney got back in their patrol car, turned on their lights and siren, and joined the pursuit.
The vehicles in the chase were traveling at a much higher rate of speed than the posted speed limit. Dill testified that he was traveling at approximately 70 to 80 miles per hour and was approximately 100 yards from Tyrone's SUV. Haynes testified that he was approximately 2 or 3 car lengths behind Dill and was traveling between 80 and 90 miles per hour.
The chase continued until Tyrone reached the intersection of Cove Access Road and Howell Cove Road, which was approximately a mile from Highway 34. The intersection was after a slight upgrade and curve in the road, and there was a four-way stop at that intersection. Tyrone attempted to proceed through the intersection at a high rate of speed. Tyrone's speed caused him to lose control of the SUV and run off the road, and he was ejected from the vehicle.
As Dill traveled around the curve, he saw the SUV turned sideways in the road about 200-300 yards away. Dill then locked his brakes and swerved. He missed the SUV, but he lost control of his patrol car and left the road. The airbag in Dill's patrol car deployed, and he was knocked unconscious but was not seriously injured.
Haynes and Courtney stopped near the SUV. After getting no response from Dill on the radio, Courtney went to check on Dill, and Haynes went to check on Tyrone. Haynes found Tyrone lying in a ditch near the road. Tyrone was still alive, but he was bleeding and severely injured and could not talk. Tyrone was taken to a hospital, where he died of injuries he suffered in the wreck.
The distance from where Tyrone was first pulled over to where the chase ended was approximately 3.2 miles, although at his deposition Dill estimated the chase had been only about 1.5 miles. Elisha asserts that the parties stipulated that the chase lasted two to three minutes.
On October 24, 2003, Tyrone's mother Elisha filed an action in the United States District Court for the Northern District of Alabama, naming as defendants the City of *Page 235 
Talladega; Alan Watson, the Chief of Police of the City of Talladega; and Dill. Elisha asserted four claims, including a claim under 42 U.S.C. § 1983, and various state-law claims. The defendants moved for a summary judgment, and on August 10, 2004, Elisha conceded that the federal-law claim was due to be dismissed. On January 28, 2005, the district court entered a summary judgment in favor of the defendants on the federal-law claim, and, under 28 U.S.C. § 1367(c)(3),[1] the court dismissed, without prejudice, Elisha's state-law claims.
On February 16, 2005, Elisha filed a wrongful-death action in the Talladega Circuit Court, naming as defendants Dill and the City of Talladega. Elisha asserted, among other claims, that Dill and the City "through . . . neglect, carelessness, unskillfulness, recklessness, willfulness, and/or wantonness caused Tyrone Gooden's death."
On April 19, 2005, the defendants moved for a summary judgment. Among other things, the defendants argued that Dill was entitled to immunity, that there was not substantial evidence to show breach of duty or causation, and that Tyrone's contributory negligence or assumption of the risk was the sole cause of his death.
On August 8, 2005, the trial court entered a summary judgment for the defendants. Elisha appealed.
 Standard of Review "`This Court's review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala. 2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala. 2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758
(Ala. 1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce "substantial evidence" as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989); Ala. Code 1975, § 12-21-12. "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assur. Co. of Fla., 547 So.2d 870, 871
(Ala. 1989).'"
Prince v. Poole, 935 So.2d 431, 442 (Ala. 2006) (quoting Dow v. Alabama Democratic Party,897 So.2d 1035, 1038-39 (Ala. 2004)).
 Discussion I.
The parties devote a significant portion of their briefs to discussing whether the defendants are immune from liability under § 6-5-338(a), Ala. Code 1975, and/or Ex parteCranman, 792 So.2d 392 (Ala. 2000). However, Elisha alleges that during *Page 236 
the high-speed chase the defendants violated a number of statutes, including § 32-5A-7, Ala. Code 1975, as well as policies and procedures set forth in the Talladega Police Department Manual ("the TPD manual"). She contends that those statutes, policies, and procedures limit the discretion conferred upon the defendants; she argues that the defendants' alleged violations of those statutes, policies, and procedures prevent the defendants from successfully asserting immunity. Thus, we must decide whether there is substantial evidence of causation or of a breach of a duty.
 II.
Elisha argues first that the summary judgment in favor of the defendants on the negligence claim was not appropriate. Elisha's allegations of negligence fall into two general categories: First, Elisha contends Dill was negligent in deciding to pursue Tyrone in a high-speed chase; second, Elisha contends Dill was negligent in carrying out the high-speed chase. Elisha summarizes her position as follows:
 "In conclusion, the hi[gh]-speed chase should have never started, and it should have been discontinued from the moment it started all the way until the wreck due to 1) the excessive rates of speed, 2) the legal speed limit in the area, 3) the conditions of the road, 4) the fact that Tyrone drove off the road 5 times, 5) the fact that Tyrone almost flipped over as he made a left turn in a[n] SUV, 6) the fact that parties were headed for a four-way stop sign at high rates of speed on a curvy road, with a rise on it, 7) the type of area in which the parties were driving, 8) it was late at night, 9) the weather conditions, 10) reckless driving, 11) violation of state statutes, 12) violation of Talladega's policies and procedures, 13) the cars went past another car and past a trailer park full of people and their property, and 14) [Talladega Police] Chief Watson committed state and federal felonies by illegally running a[n] NCIC check on Tyrone to defend the civil litigation."
(Elisha's brief, pp. 41-42 (emphasis in original).)
The defendants respond to Elisha's arguments with a number of arguments of their own; however, to affirm the trial court's summary judgment on the negligence claim we need consider only the defendants' argument that, even if Dill was negligent (which the defendants deny), Elisha has not offered substantial evidence indicating that any negligence by Dill proximately caused Tyrone to wreck the SUV and caused his resulting death.
 A. 1.
Much of Elisha's brief argues that Dill violated a number of guidelines set forth in the TPD manual regarding high-speed pursuits, as well as a number of statutory provisions. For example, the TPD manual defines "hot pursuit" as
 "an active attempt by one or more police officers to apprehend a suspect operating a motor vehicle, while the suspect is trying to avoid capture by using high speed driving or other evasive tactics such as driving off a highway, making sudden or unexpected movements, or maintaining legal speed but willfully failing to yield to the officer's signal to stop."
According to the TPD manual:
 "The purpose of hot pursuit is the apprehension of a suspect who refuses to voluntarily comply with the law requiring drivers to stop upon command. The primary goal of the department is the protection of life and property. To the *Page 237 
extent that a hot pursuit exposes any officer, suspect, or member of the general public to an unnecessary risk of harm or injury then hot pursuit is inconsistent with that goal.
 "Hot pursuit is justified only when the officer knows or has reasonable grounds to believe the suspect presents a clear and immediate threat to the safety of other motorists; has committed or is attempting to commit a serious felony; or when the necessity of immediate apprehension outweighs the level of danger created by the hot pursuit, as in the case of serious traffic violation such as [driving while intoxicated]."
Elisha interprets this language as meaning that
 "a hi[gh]-speed chase cannot occur unless the officer knows why he is chasing the suspect and then makes an informed decision that the chase falls within one of the three exceptions [i.e., (1) the suspect presents a clear and immediate threat to other motorists' safety; (2) the suspect has committed or is attempting to commit a serious felony; or (3) the level of danger created by the high-speed chase is outweighed by the necessity of immediately apprehending the suspect]."
(Elisha's brief, pp. 24-25.) Elisha claims that, in deciding to initiate hot pursuit of Tyrone, Dill violated the TPD manual. In particular, Elisha asserts:
 "Tyrone Gooden was pulled over for a broken taillight and then took off, attempting to elude the police. Dill took off, chasing Tyrone without knowing why he was chasing Tyrone and whether the chase fell within one of the three very limited exceptions for hi[gh]-speed chases. Therefore, Dill violated Talladega's policies and procedures because he did not knowingly make an informed choice. Dill also violated the policies and procedures because a broken taillight is a mere traffic violation, a misdemeanor[,] and does not fall within one of the limited three exceptions. According to the policies and procedures, this chase should have not occurred[,] and Tyrone would have never died from the hi[gh]-speed chase."
(Elisha's brief, p. 25.) Thus, Elisha argues that under the guidelines provided in the TPD manual, a broken taillight did not justify Dill's decision to pursue Tyrone.
However, as the defendants point out, Elisha is confusing the reason for the initial stop with the reason for the pursuit. Just as Elisha does not suggest that Tyrone was attempting to elude the police merely because he did not want to receive a citation for having a broken taillight, the defendants do not suggest that Dill pursued Tyrone only because the SUV he was driving had a broken taillight. Rather, the defendants argue (and the undisputed evidence in the record shows) that Dill pursued Tyrone because Tyrone was attempting to elude the police. The TPD manual allows hot pursuit for that reason; indeed, the TPD manual defines "hot pursuit" as "an active attempt by one or more police officers to apprehend a suspect operating a motor vehicle, while the suspect is trying toavoid capture by using high speed driving or other evasivetactics. . . ." (Emphasis added.)
Furthermore, it is undisputed that in addition to almost wrecking at one point in the pursuit when he turned abruptly, Tyrone drove at excessive speeds throughout the pursuit and ran off the road at least five times. Therefore, we agree with the defendants' contention that the undisputed evidence shows that the pursuit was justified under the first "exception" in the TPD manual — that is, "when the officer knows or has reasonable grounds to believe the suspect presents a clear and immediate *Page 238 
threat to the safety of other motorists." In fact, Elisha's brief concedes that Tyrone's conduct constituted reckless driving and presented a threat to others, because Elisha asserts that "both Tyrone and Dill were engaged in reckless driving, at excessive rates of speed," and Elisha cites §32-5A-190, Ala. Code 1975, the statutory definition of the offense of reckless driving, which includes as an element driving "at a speed or in a manner so as to endanger or be likely to endanger any person or property." (Elisha's brief, p. 34 (quoting § 32-5A-190, Ala. Code 1975).) Thus, Elisha's assertion that Dill did not "know why he was chasing Tyrone" is incorrect, as is her contention that the chase did not fit within one of the "limited three exceptions" for which the TPD manual permits a high-speed chase.[2] Consequently, Elisha has not offered substantial evidence indicating that under the policies and procedures reflected in the TPD manual Dill negligently decided to initiate pursuit of Tyrone.
Elisha also has not offered substantial evidence indicating that Dill's continuing the pursuit violated the TPD manual. The defendants cite the following from the TPD manual:
 "A hot pursuit shall be terminated under any of the following circumstances:
 "a. If, in the opinion of the pursuing officer[,] the commanding officer, or the field supervisor, there is a clear and unreasonable danger to the officer and other users of the highway created by the pursuit that outweighs the necessity for immediate apprehension.
 "b. The [identity of the suspect] has been established to the point that later apprehension can be accomplished, and there is no longer any need for immediate apprehension.
 "c. The prevailing traffic, roadway and environmental conditions indicate the futility of continued hot pursuit.
 "d. The pursued's vehicle's location is no longer known.
 "e. The pursuing officer knows, or is reasonably certain, that the fleeing vehicle is operated by a juvenile and the offense constitutes a misdemeanor or a non-serious felony and the safety factors involved are obviously greater than a juvenile can cope with."
We agree with the defendants' contention that Elisha has not offered substantial evidence indicating that any of those categories applied to Dill's pursuit of Tyrone. Specifically, the defendants argue:
 "First, the identity of the driver of the black SUV could not have been established by Officer Dill. Second, no traffic, roadway, or weather conditions indicated that pursuit should be stopped. Third, even if [Tyrone] could have been identified as the driver, he was not a juvenile. Therefore, the pursuit should *Page 239 
only have been terminated if any of the discretionary tests set forth in [the TPD manual] were met: (1) that the suspect did not `present a clear and immediate threat to the safety of other motorists' or (2) that the suspect had not `committed or attempt[ed] to commit a serious felony,' or (3) that `there [wa]s a clear and unreasonable danger to the officer and other users of the highway created by the pursuit that outweigh[ed] the necessity for immediate apprehension.' However, Officer Dill had reason to believe that none of these . . . reasons for ending the pursuit existed. Because [Tyrone] (1) was crossing over the center line, (2) kicked his passengers out of the car, (3) almost ran over one of his own passengers, (4) kept driving off the road, and (5) nearly flipped the SUV at the corner of Highway 34 and Cove Access [Road], all jurors would agree that Officer Dill[3] would have reasonably believed that [Tyrone] `present[ed] a clear and immediate threat to the safety of other motorists,' and that `the necessity of immediate apprehension outweigh[ed] the level of danger created by the hot pursuit.' . . . Furthermore, there was no `clear and unreasonable danger to the officer and other users of the highway created by the pursuit.' It was nearly four o'clock in the morning, the roads were dry, there was no fog, and there was only one motorist on the road."
(Defendants' brief, pp. 34-35 (citations omitted).) We agree, therefore, with the defendants' assertion that Elisha has not offered substantial evidence indicating that Dill violated any of the high-speed-chase provisions of the TPD manual.
Even if Elisha had offered substantial evidence showing that Dill had violated provisions of the TPD manual (or that Dill had been negligent in some other manner), she has not offered substantial evidence showing that any alleged negligence by Dill proximately caused Tyrone's wreck and resulting injuries. The defendants cite the following definition of proximate cause:
 "Proximate cause is an essential element of both negligence claims and wantonness claims. See Albert [v. Hsu, 602 So.2d 895 (Ala. 1992)]; Smith [v. Davis, 599 So.2d 586 (Ala. 1992)]. Proximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred. Thetford v. City of Clanton, 605 So.2d 835, 840
(Ala. 1992). An injury may proximately result from concurring causes; however, it is still necessary that the plaintiff prove that the defendant's negligence caused the injury. Buchanan v. Merger Enterprises, Inc., 463 So.2d 121 (Ala. 1984); Lawson v. General Telephone Co. of Alabama, 289 Ala. 283, 290, 267 So.2d 132, 138 (1972)."
Martin v. Arnold, 643 So.2d 564, 567 (Ala. 1994). The defendants concede that generally proximate cause is a question to be determined by the trier of the fact. Even *Page 240 
so, the question of proximate cause may be decided by a summary judgment if "`there is a total lack of evidence from which the fact-finder may reasonably infer a direct causal relation between the culpable conduct and the resulting injury.'" Green v. Alabama Power Co., 597 So.2d 1325,1328 (Ala. 1992) (quoting Davison v. Mobile Infirmary,456 So.2d 14, 24 (Ala. 1984)); see also Cooley v. Gulf Bank,Inc., 773 So.2d 1039, 1044 (Ala.Civ.App. 1999) (Crawley, J., concurring in part and dissenting in part).
The defendants contend that the decisions in Blair v.City of Rainbow City, 542 So.2d 275 (Ala. 1989), and inDoran v. City of Madison, 519 So.2d 1308 (Ala. 1988), are controlling. We agree.
In Doran, Toney Lindsey collided with a vehicle occupied by James Doran, Alesia Lake, and Suzanne Nelson. "At the time of the collision, Lindsey was attempting to elude police officers. . . ." 519 So.2d at 1309. Doran, Lake, and Nelson sued the officers and their respective employers, alleging negligence in the officers' pursuit of Lindsey.519 So.2d at 1309. The trial court entered a summary judgment in favor of the defendants, and this Court affirmed.519 So.2d at 1314.
The evidence showed that several police officers had pursued Lindsey at speeds approaching 100 miles per hour and that the officers had unsuccessfully attempted to stop Lindsey through the use of two "rolling roadblocks." 519 So.2d at 1313-14. The pursuit continued through the City of Decatur, where the vehicles traveled at a high rate of speed through several intersections. An eyewitness to the collision testified that "[a]t the time of the impact the police cars were right behind [Lindsey's vehicle] and appeared to be going about the same speed as it was going, which [the witness] estimate[d] to be 100 miles an hour." 519 So.2d at 1313.
However, this Court concluded there was not substantial evidence showing that the police officers had caused the plaintiffs' injuries. 519 So.2d at 1314. This Court noted:
 "After reviewing the affidavits . . ., we conclude that no triable issue is presented. Although neither affidavit [submitted by the plaintiffs] disputes the defendants' assertions that the police vehicles involved in the pursuit of Lindsey were flashing blue lights and sounding sirens, [one] affidavit does indicate that the police vehicles approached the intersection [where the collision occurred] at an extremely high rate of speed. Even so, neither affidavit tends to show that any of the police vehicles entered the intersection and caused the injuries sustained by the plaintiffs. It appears undisputed that none of the police vehicles collided with the plaintiffs' vehicle. These affidavits do tend to prove that the police vehicles exceeded the maximum speed limit during the pursuit; however, that matter is not disputed by the defendants. The mere fact that a police officer exceeds the maximum speed limit during a pursuit, such as the one in the present case, does not present a genuine issue of material fact as to the liability of that officer for negligence. See § 32-5A-7, [Ala. Code 1975], and Madison v. Weldon, 446 So.2d 21 (Ala. 1984). There can be little doubt that the high speed pursuit by the police officers contributed to Lindsey's reckless driving in this case. However, the rule regarding the conduct of a police officer in pursuit of an escaping offender is succinctly stated in Madison:
 "`"The rule governing the conduct of [a] police [officer] in pursuit of an escaping offender is that he must operate his car with due care and, in doing so, he is not responsible for the acts of the offender. Although pursuit *Page 241 may contribute to the reckless driving of the pursued, the officer is not obliged to allow him to escape."' (Emphasis added.)
 "446 So.2d at 28, quoting City of Miami v. Home, 198 So.2d 10 (Fla. 1967).
 "Lindsey's actions were the proximate cause of the plaintiffs' injuries, not the actions of [the police officers]; therefore, the trial court properly granted the summary judgment in favor of the defendants."
519 So.2d at 1314.
In Blair, Donald Ricky Blair led Rainbow City police in a high-speed chase. Blair's motorcycle left the road and crashed, and Blair died as a result of the injuries he sustained. A wrongful-death action was filed on behalf of Blair's estate against the police officers and the two municipalities that employed them. The trial court entered a summary judgment in favor of the defendants, and this Court affirmed. 542 So.2d at 275-76.
This Court refused to decide whether the municipalities' failure to have a written policy regarding high-speed chases was negligence, because, the Court concluded, "there [was] no evidence to show that the failure of the municipalities to have a written policy was a contributing factor in Ricky Blair's death." 542 So.2d at 276. The Court also held that the plaintiff had not offered even a scintilla of evidence[4]
showing that the officers had acted negligently in pursuing Blair. 542 So.2d at 277. In doing so, the Court relied onDoran and stated:
 "In both Doran and Madison [v. Weldon, 446 So.2d 21 (Ala. 1984)], the issue was whether the officers were liable for injuries inflicted on a third party by the fleeing offender. This case involves injuries suffered by the offender himself. If pursuing officers are not responsible for the actions of the offender if the fleeing offender injures a third party, it is only logical to conclude that officers are also not responsible for the actions of the fleeing offender when he injures himself, as is the case here. The evidence is without contradiction that Ricky could have slowed down and stopped at any time during the chase; the choice to speed and drive recklessly to evade capture was Ricky's alone. The plaintiff would have us require police officers to allow a fleeing offender to escape if the offender exceeds the speed limit; Doran and Madison have clearly rejected this contention.
 ". . . .
 "The plaintiff also argues that there was at least a scintilla of evidence of the officers' alleged negligence because there was evidence that a skid mark was found three days after the accident and, he argues, this evidence was some proof that the officers forced Ricky off the road.
 "Officer Gilbreath states in his affidavit, deposition, and sworn interrogatory answers that he never got within 100 yards of the motorcycle. He said he was approximately 100 yards behind Blair when the motorcycle veered off the pavement. The testimony of [O]fficer Gilbreath is not controverted by any other evidence.
 "The plaintiff offered Martin Crawford as an accident reconstruction expert. Crawford, however, stated affirmatively: *Page 242 
 "`There is no evidence at the scene to conclusively state that the police car did force the motorcycle off the road.'
 "There is no evidence at all to show that the skid mark was made by Officer Gilbreath's police unit, nor is there any evidence to prove that the skid mark was created at the time of the accident.
 "`Speculation and conclusory allegations are insufficient to create a genuine issue for trial.' Bogle v. Scheer, 512 So.2d 1336, 1340
(Ala. 1987). All the evidence before the trial judge indicates that none of the officers was within 100 yards of Ricky at the time of the crash and that the officers did nothing to cause the crash other than to pursue Ricky. The mere fact that a skid mark was found, without more, cannot give the plaintiff a right to a trial, even under the scintilla rule."
542 So.2d at 276-77.
In this case, it is undisputed that Tyrone wrecked because he lost control of the SUV as a result of his excessive speed. The defendants included in their summary-judgment materials a report prepared by the Traffic Homicide Unit of the Highway Patrol Division of the Alabama Department of Public Safety, which states:
 "[As Dill and Tyrone] approached the intersection of Cove Access R[oad] and Howell Cove R[oad] the driver of the [SUV] lost control of his vehicle. The [SUV] came through the 4-way intersection at a high rate of speed. The travel path of the [SUV] was over [a] small rise in the road and into a slight curve. This slight curve was magnified by the velocity that the vehicle was traveling. The driver of the [SUV] lost control of his vehicle in the curve and ran off the road to the right. The [SUV] came back onto the road sideways, the vehicle[']s wheels began to dig into the pavement causing the vehicle to overturn. The driver was ejected from the vehicle and came to rest in the ditch on the north side of Cove Access R[oad]. The vehicle continued to overturn and came to a stop in the road facing northeast.
 ". . . .
 "There was no contact at any time made between [Dill's patrol car and the SUV]. This is supported by the damage to both vehicles and the markings on the roadway. It is clearly shown by the skid marks left on the roadway that Officer Dill locked the brakes on his vehicle prior to the point that Tyrone Gooden lost control of his vehicle and left the roadway. This supports Officer Dill's statement that he applied his brakes when he saw Tyrone Gooden's vehicle sliding sideways because he did not want to hit the other vehicle. The damage to both vehicles is relative to the events that took place in their collision path. There is no damage to either vehicle that was caused by another vehicle.
 "This investigator determined that the [SUV] driven by Tyrone Gooden wrecked due to his excessive speed. The speed led to his inability to negotiate through the curve in the road. This caused him to straighten out the curve and leave the road. [Dill's patrol car] left the roadway due to the driver locking up the brakes to avoid the [SUV]. After [Dill] locked the brakes he slid straight off the road in the direction he was traveling prior to lock up; [Dill] didn't have any control after he locked the brakes."
Elisha does not dispute the accuracy of the statements included in that report. Nor does Elisha dispute Dill's testimony that when he first noticed that Tyrone's SUV was sideways in the road (that is, after Tyrone had wrecked), Dill was 200-300 yards away from the SUV. *Page 243 
At pages 59-63 of her brief, Elisha purports to address the issue of proximate causation. However, she fails to articulate with any specificity how Dill allegedly caused Tyrone to wreck; instead, she cites a general statistic regarding the number of deaths that are thought to result each year from high-speed pursuits, and she essentially repeats her contention that Dill violated guidelines set forth in the TPD manual, as well as various statutes. In short, her theory of causation is analogous to the theory in Blair. The evidence indicates that Dill was more than 200-300 yards from the SUV when the SUV wrecked. Moreover, the evidence is undisputed that Tyrone could have slowed down and stopped at any time during the chase — indeed, Tyrone initially had stopped for Officers Courtney and Haynes. Therefore, "the choice to speed and drive recklessly to evade capture was [Tyrone's] alone."Blair, 542 So.2d at 276. To conclude that Dill proximately caused Tyrone to wreck requires speculation or conjecture; it is not supported by substantial evidence in the record.
Elisha contends, however, that Doran andBlair are distinguishable and that the decision inSeals v. City of Columbia, 641 So.2d 1247 (Ala. 1994), controls. In Seals, Jimmy H. Watford led a police officer of the City of Columbia on a high-speed chase that ended when Watford's vehicle struck another vehicle head-on. The driver of the other vehicle was killed, and her estate sued the police officer and the City. The trial court entered a summary judgment in favor of the officer and the City, but this Court reversed that judgment. 641 So.2d at 1248-50.
In Seals there was evidence indicating that a roadblock was in place to stop Watford and that the police officer was notified of the roadblock. The officer testified that when an officer was notified that a roadblock was in place, the proper procedure was to turn off the vehicle's lights and siren and stop the high-speed pursuit "`in hopes that [the fleeing offender] will slow down rather than run straight into the roadblock and cause a collision.'"641 So.2d at 1248 (quoting the officer's deposition testimony).
Although the officer testified that he had followed the proper procedure and ended the pursuit when he was notified of the roadblock, that testimony was contradicted by the affidavit of an eyewitness who stated that he saw the officer in hot pursuit of Watford at the precise point the officer stated he had ended the chase. The eyewitness stated further that the police vehicle's lights and siren were still engaged as well.641 So.2d at 1249.
In addition, the plaintiff in Seals offered expert testimony asserting that the officer had operated his police car negligently during the pursuit. The expert testified that the police officer "`should have discontinued the chase some two miles prior to the place where the wreck occurred, when [the officer] first saw that the Watford vehicle hadturned its lights off" 641 So.2d at 1249 (emphasis added). The expert testified further "`that a collision with a third oncoming car was foreseeable and almost inevitable if the chase continued [and] that no pursuit was necessary because aroad block was in place.'" 641 So.2d at 1249 (emphasis added in Seals).
This Court in Seals distinguished Blair andDoran in the following manner:
 "The City would have us affirm the summary judgment on the authority of Blair v. City of Rainbow City, 542, So.2d 275 (Ala. 1989), and Doran v. City of Madison, 519 So.2d 1308 (Ala. 1988). While we reverse the summary judgment in this case, we note that this reversal is not inconsistent with our holdings in Blair and Doran. *Page 244 
 "In Blair, the administrator of the estate of Donald Ricky Blair, who was killed while being pursued at a high speed by the police, sued Rainbow City and others, alleging that they were responsible for Donald Blair's death. . . . In Blair, it was the fleeing offender who was killed in the chase. He had ignored the siren and blue light signals of the officers to pull over. In doing so, he elected to evade the police, and he died as a result of injuries when his own motorcycle left the road. 542 So.2d at 276. Clearly, in Blair, the fleeing offender was responsible for his own injuries, because, as this Court stated in the opinion, he could have pulled over at any time during the chase. 542 So.2d at 276.
 "In Doran, police officers were pursuing a vehicle driven by a person suspected of driving under the influence of alcohol. 519 So.2d at 1310. In support of their motion for summary judgment, three officers offered affidavits tending to show that at all times during their pursuit of the vehicle they had used their sirens and their blue lights. The accident occurred when the fleeing vehicle proceeded through an intersection and struck another vehicle. The police cars were not involved in the collision.
 "In Doran, in opposition to the motion for summary judgment, the plaintiff offered affidavits tending to show that the police officers exceeded the speed limit while in pursuit; however, there was no evidence offered to show that they did not exercise due care in their pursuit. 519 So.2d at 1314. . . .
 ". . . .
 "Again, this Court stated in Seals v. City of Columbia, 575 So.2d 1061 (Ala. 1991):
 "`Neither Madison v. Weldon, nor Blair v. City of Rainbow City, nor Doran v. City of Madison stands for the proposition that in order to state a claim upon which relief could be granted, Seals had to specifically allege that Officer Cook's vehicle came into contact with the vehicle in which his daughter was riding or that Officer Cook otherwise "directly" caused his daughter's death.'
 "575 So.2d at 1064.
 "In opposition to the motion for summary judgment, Seals offered evidence tending to show that Cook did not discontinue his pursuit of Watford once the roadblock was in place. While Cook disputed this fact, he did state in his deposition that in regard to pursuit of a fleeing offender, proper procedure was to back off once a roadblock was in place. Seals's expert testified that Cook acted negligently and that no pursuit was necessary because a road block was in place. Thus, the plaintiffs evidence created a genuine issue of material fact. The summary judgment was inappropriate and must be reversed."
641 So.2d at 1249-50.
Elisha's case, however, is distinguishable fromSeals. In Seals, a genuine issue of material fact existed as to whether the pursuing officer had violated the rule requiring a pursuit to end once the officer was notified of the existence of a roadblock. Moreover, there was expert testimony in Seals to the effect that the officer was negligent by continuing to pursue the suspect after the suspect had turned off the headlights on his vehicle. Thus, in Seals the plaintiff's theory of proximate causation was supported by more than speculation or conjecture; that is, there was substantial evidence suggesting that the officer was negligent and that his negligence had proximately caused the death of the driver of the vehicle struck by the fleeing suspect's vehicle. *Page 245 
However, as we have discussed, in this case Elisha has not offered substantial evidence suggesting that Dill negligently pursued Tyrone or that he negligently continued the pursuit. In addition, Elisha has not articulated a theory of proximate causation supported by anything other than speculation or conjecture. Therefore, Doran and Blair are controlling.[5]
 2.
In addition to guidelines of the TPD manual, Elisha claims that Dill violated a number of statutes and that those alleged violations are substantial evidence of negligence. For example, Elisha cites § 32-5A-7, Ala. Code 1975, which governs drivers of "authorized emergency vehicles" such as Dill. Section 32-5A-7(b)(3) permits a driver such as Dill to "[e]xceed the maximum speed limits so long as he does not endanger life or property." Section 32-5A-7(d) also provides:
 "(d) The foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others."
(Emphasis added.) Section 32-5A-7(b)(2) requires the driver of an authorized emergency vehicle to "slow down as may be necessary for safe operation" before "[p]roceed[ing] past a red or stop signal or stop sign."
Elisha also cites § 32-5A-170, Ala. Code 1975, which provides:
 "No person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing. Consistent with the foregoing, every person shall drive at a safe and appropriate speed when approaching and crossing an intersection or railroad grade crossing, when approaching and going around a curve, when approaching a hill crest, when traveling upon any narrow or winding roadway, and when special hazards exist with respect to pedestrians or other traffic or by reason of weather or highway conditions."
We disagree with Elisha's contention that any alleged violation of those statutory provisions means that the summary judgment for Dill and the City was inappropriate. As with Elisha's allegations regarding the requirements of the TPD manual, there is no evidence indicating that Dill's alleged violations of the statutory provisions proximately caused Tyrone to wreck.
 3.
At pages 36-38 of her brief, Elisha argues that the Talladega police chief illegally accessed the NCIC database for the sole purpose of defending against the wrongful-death action she filed. Elisha cites Alabama Power v. Murray,751 So.2d 494, 496-97 (Ala. 1999), for the proposition that the alleged illegal accessing of the NCIC database may be used to infer negligence on the part of Dill and the City. We disagree. *Page 246 
In Murray, this Court held that there was sufficient evidence to support an instruction to the jury that it could consider Alabama Power's alleged spoliation of evidence essential to the plaintiffs' case as an inference of Alabama Power's culpability. Even if the Talladega police chief accessed the NCIC database and did so illegally, there is nothing to indicate that Murray applies to this case. Consequently, Elisha's argument is without merit.
 B.
Elisha also alleges that there is substantial evidence showing that Dill acted wantonly. Specifically, Elisha argues that Dill drove at reckless speeds. She contends that those speeds, when viewed with the other circumstances of the chase, are substantial evidence of wantonness.
We disagree that Elisha has offered substantial evidence of wantonness. Even if there were substantial evidence of wantonness, however, Elisha has not offered substantial evidence to show that any alleged wantonness by Dill proximately caused Tyrone's death. Thus, Elisha's arguments regarding wantonness likewise are without merit.[6]
 Conclusion
The summary judgment in favor of the City of Talladega and Daniel Dill is affirmed.
AFFIRMED.
COBB, C.J., and SEE, WOODALL, and PARKER, JJ., concur.
[1] When all federal claims in an action are dismissed with prejudice, § 1367(c)(3) permits a federal court to decline to exercise supplemental jurisdiction over any remaining state-law claims. Section 1367(d) tolls the limitations period for the dismissed state-law claims for at least 30 days, thereby providing an opportunity for the claims to be refiled in a state court.
[2] In arguing that Dill was "ignorant" of why Tyrone had been pulled over or why Dill was chasing him, Elisha implies that Dill should have contacted Officers Haynes and Courtney by radio to determine why they had stopped Tyrone's vehicle. See,e.g., Elisha's brief, p. 25 ("The defendants also claim Dill cannot be blamed for failing to find out from dispatch or Haynes and Courtney why Tyrone had been pulled over before Dill engaged in the hi[gh]-speed chase with Tyrone."). However, as noted, Dill knew why he was chasing Tyrone, and the pursuit was justified, in accordance with the TPD manual. Moreover, the undisputed evidence shows that, to minimize distractions, the officers had been trained to keep their communications to a minimum during a chase. See Dill's deposition.Cf. TPD manual ("The assisting unit, upon joining the pursuit shall immediately notify the communications center of its identity. If the primary unit is a one-man unit, the assisting unit may assume radio communications responsibility, allowing the primary unit to devote full attention to driving.").
[3] Elisha disputes that Dill was aware of reasons (1) and (3) — that Tyrone was crossing over the centerline and that he almost ran over one of his own passengers. However, that factual dispute is immaterial. First, reasons (2), (4), and (5), along with the fact that Tyrone was driving at excessive speeds, lead to the conclusion asserted by the defendants — that is, "all jurors would agree that Officer Dill would have reasonably believed that [Tyrone] `present[ed] a clear and immediate threat to the safety of other motorists,' and that `the necessity of immediate apprehension outweigh[ed] the level of danger created by the hot pursuit.'" Second, even if those reasons did not lead to that conclusion, the factual dispute is immaterial because, as we discuss, Elisha has not offered substantial evidence that Dill's continuing the pursuit proximately caused Tyrone to wreck.
[4] The complaint in Blair was filed before the scintilla rule was abolished in favor of the substantial evidence rule. The scintilla rule of evidence was abolished effective June 11, 1987. See § 12-21-12, Ala. Code 1975.
[5] Elisha also cites the requirement in the TPD manual that
 "[a]ll units in pursuit, whether the vehicle in front of the unit is the suspect vehicle or another police vehicle, shall space themselves at a distance that will ensure proper braking and reaction time in the event the lead vehicle stops, slows, or turns."
Elisha asserts Dill negligently violated that requirement because Dill lost control of his vehicle when he locked his brakes to avoid hitting Tyrone's wrecked SUV. Even if that assertion is true, however, Elisha does not explain how Dill's alleged violation of that requirement proximately caused Tyrone to wreck.
[6] Because Elisha has not offered substantial evidence of negligence, wantonness, or proximate cause, we pretermit consideration of the defendants' contention that Tyrone was contributorily negligent as a matter of law.